[No. 27528. Department One. August 21, 1939.]

O. B. FORNILI *et al., Appellants,* v. AUTO MECHANICS' UNION LOCAL NO. 297 OF THE INTERNATIONAL ASSOCIATION OF MACHINISTS *et al., Respondents.*[1]

*Burkey & Burkey,* for appellants.

*L. B. Sulgrove* and *John Geisness,* for respondents.

MAIN, J.—This action was brought seeking injunctive relief. At the time the complaint was filed, a temporary restraining order was issued, and also a show cause order. Upon the return day of the show cause order, a hearing was had, the result of which was the denial of a temporary injunction. Subse-

[1]Reported in 93 P. (2d) 422.

quently, the case came on for trial upon the merits, and the court refused a permanent injunction. From the judgment dismissing the action, the plaintiffs appealed.

The respondent Auto Mechanics' Union Local 297 will be referred to as the union, and C. E. Rowley, who is the business representative of the union, will be referred to as the business agent. The appellants, O. B. Fornili and Emma Fornili, his wife, for a number of years, owned and operated a business in the city of Tacoma for the sale of used cars, gas, oil, and gasoline, and, in connection therewith, they conducted an automobile repair shop. They owned the building in which the business was conducted. The repair shop, while located under the same roof, was in a different room from that devoted to the remainder of the business. For a number of years, they had employed several men in the shop.

In 1936, the place was picketed by the union, and, as a result thereof, the parties entered into a written agreement for one year to employ none but union mechanics. This agreement was succeeded by a similar one, entered into early in the year 1937, which, by its terms, expired June 16, 1938.

In February of that year, the appellants say that they leased the repair shop to one Manuel A. Becker. The respondents dispute this, and claim that Becker was, in truth and in fact, an employee of the appellants, and the pretended lease was simply a subterfuge to avoid the terms of the contract. In considering the case, we will accept the view of the respondents as to the nature of the relation between Becker and the appellants.

During the time that the contract was in force, there was more or less difficulty between the appellants and the union, due, as it appears, largely over hours. Be-

fore June 16th, and from time to time during the life of the contract, there was picketing. After the contract expired, there was no picketing until the 30th of September following.

From the time that Becker went into the shop, the appellants, in addition to him, had only one employee, who worked generally in the salesroom, and was what might be referred to as a "handy man." Neither Becker nor the other employee belonged to the union. So far as the record shows, they were satisfied with their wages, hours, and working conditions. No dispute had arisen between either one of them and the appellants.

The business agent testified that, when they resumed September 30th, the same conditions existed as existed when they were picketing the place prior to the expiration of the contract. But we cannot accept this as a correct view of the situation. The contract was not in existence when the picketing was resumed, and the situation stood at that time as if there had been no previous contract. We will make no further reference to the picketing during the life of the contract, because that matter is wholly immaterial at this time. At no time did either of the parties ask to have the contract renewed, and there were no negotiations· between them with reference to a renewal.

■ In the case of *Safeway Stores v. Retail Clerks' Union*, 184 Wash. 322, 51 P. (2d) 372, it was held that, where there was no controversy between an employer and the employees, a third party could not picket the business for the purpose of coercing the managers of the stores into inducing or persuading their employees to become members of the union, for the reason, as there stated, there did not exist a labor dispute. In that case, it was said:

"The vital, controlling question at issue here is plain and easy of solution. It in no way pertains to the relations between the appellant, a merchant, and its employees. For aught that appears, they are content and satisfied, among themselves. On the contrary, this is a lawsuit between appellant and a third party—a labor union that does not include in its membership any employee of the appellant. What right have the respondents to insist or demand, at the threat or cost of the destruction of appellant's business, or at all, that appellant ask, urge or coerce, directly or indirectly, its employees, who are at liberty to do as they please, to join respondents' organization? Of course, there is nothing unlawful in hiring clerks or salesmen who are not members of a local organization such as the respondent; and any attempt, like that in this case, to deny or cripple one's right to do so is an unwarranted attempt by individuals or persons to unreasonably interfere with the freedom of the liberty and property right of contract.

"The conduct of respondents, in conjunction with that of appellant, cannot be termed a labor dispute. It is an unwarranted attempt on the part of respondents to compel appellant, against its right of choice, to become active in the cause of respondents, with the result that, upon the failure of that attempt, respondents purposely commenced and continued picketing, to appellant's damage in the large sum of $2,200 in less than four months' time, with the avowed intention of continuing the same to manifest, irreparable injury and damage to the appellant."

That case, in the case of *Adams v. Building Service Employees International Union, Local No. 6,* 197 Wash. 242, 84 P. (2d) 1021, was cited with approval.

The holding in the case of *Kimbel v. Lumber & Saw Mill Workers Union,* 189 Wash. 416, 65 P. (2d) 1066, is not applicable to the facts in the case now before us. That case involved the picketing of a logging camp, and is not an authority which supports the judgment in this case.

In *Blanchard v. Golden Age Brewing Co.,* 188 Wash. 396, 63 P. (2d) 397, it was said:

"The right to earn a livelihood and to continue in employment unmolested by unwarranted activities of third persons is entitled to protection in equity. *Truax v. Raich,* 239 U. S. 33, 36 S. Ct. 7, 60 L. Ed. 131, Ann. Cas. 1917B, 283. A correlative principle is that the employer has the right freely to maintain relations of employment with whomsoever he desires, and no one has the right purposely to disrupt or interfere with those relations by the intentional resort to such measures as will obviously, and in the ordinary course of events, inflict irreparable injury upon the employer. *Hitchman Coal & Coke Co. v. Mitchell,* 245 U. S. 229, 38 S. Ct. 65, 62 L. Ed. 260, Ann. Cas. 1918B, 461. Both of the cases just cited are authority for the further rule that it is immaterial whether the employment be for a term or at will."

The rule of the *Safeway Stores* case, as already indicated, is controlling here. In this case, there was no controversy or dispute between the appellants, the employers, and the employees. The picketing was resumed by a third party. It is not clear from the record whether the purpose of the picketing was to coerce the appellants into having their employees become union men, or whether its purpose was to punish them for failing to live up to the terms of their contract while it was in effect. In either event, the picketing was not lawful. The business agent testified, referring to the appellant O. B. Fornili, that "we had a fight on with him." The witness further testified that he heard the secretary of the union state to a third party that they were going to do to Fornili "what had been done to Stoner," referring to the Stoner Motor Company, which had been previously picketed and had been compelled to quit business on account of labor difficulties.

At the conclusion of the hearing on the merits in this case, the appellants were entitled to a permanent

injunction. It is said, however, that there was no probability of picketing being resumed, and, for this reason, a permanent injunction was properly refused. In this connection, the business agent testified:

"In this case the pickets have not been placed back since they were taken off under the original order of the Court. I do not know what the organization [union] may do with reference to it, nor is anyone able to tell until the organization takes a vote on it."

The facts in this case are entirely different from what they were in *Commercial Bindery & Printing Co. v. Tacoma Typographical Union No. 170*, 85 Wash. 234, 147 Pac. 1143. The record here is not sufficient to establish that there was no probability that picketing would be resumed if injunctive relief was denied.

The judgment will be reversed, and the cause remanded with direction to the superior court to enter a judgment permanently enjoining the respondents from picketing the place of business of the appellants.

JEFFERS, ROBINSON, and STEINERT, JJ., concur.

BLAKE, C. J. (dissenting)—In view of the principle that the rule of a case does not become *stare decisis* until followed in subsequent decisions (14 Am. Jur. 295, § 82; *McDonald v. Davey*, 22 Wash. 366, 60 Pac. 1116; *State ex rel. Bloedel-Donovan Lumber Mills v. Savidge*, 144 Wash. 302, 258 Pac. 1), I think the law laid down in *Safeway Stores* should be reexamined in the light of recent decisions of the supreme court of the United States and courts of last resort in other states, construing the Norris-LaGuardia act and acts patterned after it. For Laws of 1933, Ex. Ses., chapter 7, p. 10 (Rem. Rev. Stat. (Sup.), §§ 7612-1 to 7612-14 [P. C. §§ 3467-21 to 3467-34]) is identical in terms and purpose with that act, and the *Safeway Stores* case is completely out of harmony with the construction placed

upon that act by the supreme court of the United States and the construction placed upon similar acts by courts of other states. *New Negro Alliance v. Sanitary Grocery Co.,* 303 U. S. 552, 82 L. Ed. 1012, 58 S. Ct. 703; *Schuster v. International Ass'n of Machinists, etc.,* 293 Ill. App. 177, 12 N. E. (2d) 50; *Local Union No. 26, etc. v. Kokomo,* 211 Ind. 72, 5 N. E. (2d) 624, 108 A. L. R. 1111; *Wallace Co. v. International Ass'n of Mechanics, etc.,* 155 Ore. 652, 63 P. (2d) 1090; *Senn v. Tile Layers Protective Union, Local No. 5,* 222 Wis. 383, 268 N. W. 270, 872, affirmed 301 U. S. 468, 81 L. Ed. 1229, 57 S. Ct. 857.

In those decisions, provisions identical or similar to §§ 4(e) and 13(c), chapter 7, Laws of 1933, Ex. Sess., pp. 12, 17 (Rem. Rev. Stat. (Sup.), § 7612-4 [P. C. § 3467-24] subd. (e) and § 7612-13 [P. C. § 3467-33], subd. (c)), have been accepted for what they say in plain and unambiguous terms:

"Sec. 4. No court of the State of Washington shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute or prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts: . . .

" (e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence; . . .

"Sec. 13. When used in this act, and for the purpose of this act— . . .

" (c) The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

In other words, it is held in those cases that a labor union, by its members and sympathizers, may maintain a picket line to coerce an employer to operate a "closed shop," even though there be no controversy between him and his employees. The only limitation upon the right is that it shall be exercised without "fraud or violence." There is nothing in the record in the instant case that savors in the remotest degree of "fraud or violence." The threat of the union members that they would put appellant out of business and the statement that they had put other employers who had refused to comply with their demands out of business, are nothing more than "seller's talk," designed to impress the employer with the power of the picket line to create a public opinion against him for operating an "open shop."

In *New Negro Alliance v. Sanitary Grocery Co., supra,* the court said:

"Petitioners have written respondent letters threatening boycott and ruination of its business and notices that by means of announcements, meetings and advertising the petitioners will circulate statements that respondent is unfair to colored people and to the colored race and, contrary to fact, that respondent does not employ colored persons; . . .

"The Act does not concern itself with the background or the motives of the dispute. The desire for fair and equitable conditions of employment on the part of persons of any race, color, or persuasion, and the removal of discriminations against them by reason of their race or religious beliefs is quite as important to those concerned as fairness and equity in terms and conditions of employment can be to trade or craft unions or any form of labor organization or association. Race discrimination by an employer may reasonably be deemed more unfair and less excusable than discrimination against workers on the ground of union affiliation. There is no justification in the apparent purposes or the express terms of the Act for limiting its definition

of labor disputes and cases arising therefrom by excluding those which arise with respect to discrimination in terms and conditions of employment based upon differences of race or color. . . .

"The legislative history of the Act demonstrates that it was the purpose of the Congress further to extend the prohibitions of the Clayton Act respecting the exercise of jurisdiction by federal courts and to obviate the results of the judicial construction of that Act. It was intended that peaceful and orderly dissemination of information by those defined as persons interested in a labor dispute concerning 'terms and conditions of employment' in an industry or a plant or a place of business should be lawful; that, short of fraud, breach of the peace, violence, or conduct otherwise unlawful, those having a direct or indirect interest in such terms and conditions of employment should be at liberty to advertise and disseminate facts and information with respect to terms and conditions of employment, and peacefully to persuade others to concur in their views respecting an employer's practices. The District Court erred in not complying with the provisions of the Act."

In *Schuster v. International Ass'n of Machinists, etc.,* *supra,* the court said:

"While plaintiff complains about the presence of the pickets that alternated in front of his place of business, *his real complaint unquestionably is against the publicity given by the signs carried by them proclaiming the truth as to the unfairness of his attitude toward organized labor.* He persists in his refusal to deal with a labor union and yet he resents as an infringement of his rights the disclosure by that union to the public, including members of labor unions and their sympathizers, of his antagonism to organized labor. His position that, notwithstanding his antagonism to the union, the law must silence the voice of organized labor lest he may suffer any ill consequences as a result of his attitude, is untenable. It is, of course, his right and privilege to refuse to deal with the union and to operate a nonunion shop, but, in our opinion, it is just as much the right and privilege of the union, when he

so refuses, to publish the fact that it regards him as unfair to it. What inalienable right has an employer who is unfair in the eyes of organized labor to the favor of the continued patronage of its members and friends?

"It has been repeatedly held that where an employer refuses to employ union labor, labor organizations may freely publish in their own official organs and other newspapers, in pamphlets or circulars, or by means of the radio, the fact that such employer is unfair to organized labor. Then, why is it not just as lawful for a labor union to make publication of the employer's unfairness by signs carried peaceably by a member or members of the interested union in the vicinity of the place of business of the employer?"

But, apart from the right to picket established by our Norris-LaGuardia act, the injunction which the court here directs to issue, will infringe rights guaranteed to respondent by the fourteenth amendment to the constitution of the United States. For to accord workers in labor disputes the right of "peaceful picketing" and "peaceable persuasion" is but to uphold them in their right to assemble and publicize their grievances. *Hague v. Committee for Industrial Organization,* 307 U. S. 496, 59 S. Ct. 954, Case No. 651, October Term 1938, decided June 5, 1939. While the right of patrolling or picketing was only incidentally involved in that case, the court held that the right to assemble and speak cannot be circumscribed by a municipal ordinance prohibiting public gatherings without a permit first obtained from a designated official. In that case, Mr. Justice Stone said:

"It has been explicitly and repeatedly affirmed by this Court, without a dissenting voice, that freedom of speech and of assembly for any lawful purpose are rights of personal liberty secured to all persons, without regard to citizenship, by the due process clause of the Fourteenth Amendment. . . .

"Both courts below found, and the evidence supports the findings, that the purpose of respondents, other

than the Civil Liberties Union, in holding meetings in Jersey City, was to organize labor unions in various industries in order to secure to workers the benefits of collective bargaining with respect to betterment of wages, hours of work and other terms and conditions of employment. . . . True, the findings refer to the suppression by petitioners of exhibits, one of which turns out to be a handbill advising workers they have the legal right, under the Wagner Act, to choose their own labor union to represent them in collective bargaining. But the injunction, which the Court now rightly sustains, is not restricted to the protection of the right, said to pertain to United States citizenship, to disseminate information about the Wagner Act. On the contrary it extends and applies in the broadest terms to interferences with respondents in holding any lawful meeting and disseminating any lawful information by circular, leaflet, handbill and placard. If, as my brethren think, respondents are entitled to maintain in this suit only the rights secured to them by the privileges and immunities clause of the Fourteenth Amendment—here the right to disseminate information about the National Labor Relations Act—it is plain that the decree is too broad. Instead of enjoining, as it does, interferences with all meetings for all purposes and the lawful dissemination of all information, it should have confined its restraint to interferences with the dissemination of information about the National Labor Relations Act, through meetings or otherwise. The court below rightly omitted any such limitation from the decree, evidently because, as it declared, petitioners' acts infringed the due process clause, which guarantees to all persons freedom of speech and of assembly for any lawful purpose. . . .

" . . . It is enough that petitioners have prevented respondents from holding meetings and disseminating information whether for the organization of labor unions or for any other lawful purpose."

And Mr. Justice Roberts said:

" . . . What has been said demonstrates that, in the light of the facts found, privileges and immunities of the individual respondents as citizens of the United

States, were infringed by the petitioners, by virtue of their official positions, under color of ordinances of Jersey City, unless, as petitioners contend, the city's ownership of streets and parks is as absolute as one's ownership of his home, with consequent power altogether to · exclude citizens from the use thereof, or unless, though the city holds the streets in trust for public use, the absolute denial of their use to the respondents is a valid exercise of the police power.

. . .

" . . . Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens."

Even in broader terms, in the case of *Lovell v. Griffin,* 303 U. S. 444, 82 L. Ed. 949, 58 S. Ct. 666, did that court deny a municipality the right to prohibit the use of the streets for the peaceable dissemination of propaganda. Speaking through Mr. Chief Justice Hughes, the court there said:

"We think that the ordinance is invalid on its face. Whatever the motive which induced its adoption, its character is such that it strikes at the very foundation of the freedom of the press by subjecting it to license and censorship. The struggle for the freedom of the press was primarily directed against the power of the licensor. It was against that power that John Milton directed his assault by his 'Appeal for the Liberty of Unlicensed Printing.' And the liberty of the press became initially a right to publish '*without* a license what formerly could be published only *with* one.' While this freedom from previous restraint upon publication cannot be regarded as exhausting the guaranty of liberty, the prevention of that restraint was a leading purpose in the adoption of the constitutional provision. See *Patterson v. Colorado,* 205 U. S. 454, 462; *Near v. Minnesota,* 283 U. S. 697, 713-716; *Grosjean v. American*

*Press Co.,* 297 U. S. 233, 245, 246. Legislation of the type of the ordinance in question would restore the system of license and censorship in its baldest form.

"The liberty of the press is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets. These indeed have been historic weapons in the defense of liberty, as the pamphlets of Thomas Paine and others in our own history abundantly attest. The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion. What we have had recent occasion to say with respect to the vital importance of protecting this essential liberty from every sort of infringement need not be repeated. *Near v. Minnesota, supra; Grosjean v. American Press Co., supra; De Jonge v. Oregon* [299 U. S. 353, 81 L. Ed. 278, 57 S. Ct. 255], *supra."*

Of course, an injunction infringing rights guaranteed by the fourteenth amendment has no greater sanctity than a city ordinance which contravenes such rights. A court has no more right to impinge upon the privileges and immunities guaranteed to citizens than has a city council.

I dissent.