[No. 31178. *En Banc.* December 14, 1950.]

LOUIS OSTROFF, *Appellant,* v. LAUNDRY & DYE WORKS DRIVERS' LOCAL No. 566 *et al., Respondents.*[1]

*Hamlet P. Dodd,* for appellant.

*Bassett & Geisness,* for respondents.

DONWORTH, J.—This action was brought to enjoin the picketing of plaintiff's cleaning and dyeing establishment by the defendant union. An order to show cause was issued and upon the return day the cause was, by stipulation of the parties, tried on its merits upon oral testimony and documentary evidence. At the conclusion of the trial, the court rendered an oral opinion holding that there was

[1]Reported in 225 P. (2d) 419.

a labor dispute within the meaning of Rem. Rev. Stat. (Sup.), § 7612-1 [P.P.C. § 695-1] *et seq.,* and that the court had no power to issue the injunction sought by the plaintiff. No findings of fact were made by the court, but a decree was subsequently entered dismissing the plaintiff's complaint. From this disposition of the case, plaintiff has appealed.

The essential facts are that appellant has for some eight years been operating a "cash and carry" cleaning and dyeing business in Seattle consisting of two plants and four stores. During this period he has done business at a profit. He has some twenty-five employees, none of whom belonged to any union. For some time he has been listed as "unfair" by the Seattle Labor Council because of having constructed one of his buildings with nonunion labor.

In October, 1948, appellant employed one Kreiger as a truck driver to operate his trucks between the cleaning and finishing plants and his four stores. He was paid fifty dollars per week for an average of forty-five hours work. Kreiger never complained to appellant about his rate of pay, his hours or working conditions. In March, 1949, Kreiger, without appellant's knowledge, joined the respondent union.

This union is chartered by the International Brotherhood of Teamsters, Chauffers, Warehousemen and Helpers of America, and is affiliated with the local union chartered by the International Laundry Workers and Dry Cleaners Union. Over ninety per cent of the cleaning and dyeing stores in the Seattle area employ members of these unions and operate under union contracts.

In April and May, 1949, representatives of the respondent union called upon appellant for the purpose of obtaining his signature on a union contract. In the early part of May, they submitted a contract (consisting of a typewritten document and two printed documents) which he examined and later advised the union representatives that he would not sign. The effect of signing this would have been that

all of appellant's employees would either have had to join one of the unions involved or seek employment elsewhere.

About eight a. m. on May 23, 1949, the two union representatives, accompanied by Kreiger, went to appellant's office and asked him if he had changed his mind about signing the contract and he replied in the negative. They then informed him that Kreiger was a member of their union.

Immediately thereafter, Kreiger and other members of the respondent union began to picket appellant's six places of business bearing signs stating "Spic N Span Dry Cleaners refuses to pay union wages—Laundry and Dye Works Drivers Local 566." This peaceful picketing has continued since its inception.

At the trial, appellant testified that prior to the picketing his gross receipts were two thousand five hundred dollars per week and subsequently they were reduced to one thousand seven hundred dollars. In addition, he has been compelled to obtain his supplies by driving his own trucks, since union drivers would not make deliveries through the picket lines.

After the picketing began, a meeting of appellant's employees was called, which was attended by all of them except Kreiger and one employee who was on vacation. Appellant and his counsel were present at the beginning of the meeting. The attorney addressed the employees telling them that they were free to join a union or not to do so as they saw fit. He left with them a form of statement reading as follows:

"WE, THE UNDERSIGNED, being employees of LOUIS OSTROFF, doing business as SPIC 'N SPAN CLEANERS in four locations in the City of Seattle, after an open meeting without coercion, in the presence of persons who are employees only, hereby declare that it is not our wish and desire to join any union, Teamsters Local, or otherwise; that we are fully aware of our rights to join such union, and that we are opposed to the said LOUIS OSTROFF, or any of his agents, entering into a contract with the

Teamsters or any other related union, unionizing these plants.

"DONE AT SEATTLE, WASHINGTON, this 6th day of June, 1949."

After appellant and his counsel had left the meeting, the employees present discussed the matter and all of them signed the statement.

There is a conflict in the evidence as to whether appellant's scale of wages is higher or lower than the union scale, but we do not deem it necessary to pass upon that issue in deciding this case.

Appellant testified that the union contract, which he declined to sign, would have compelled him to pay Kreiger $387 per week (based on 15% of the gross receipts of $2500) instead of $50 per week. Respondent union contends that if, after negotiating, the parties had determined Kreiger to be a wholesale driver, his commission would have been three per cent plus $55 per week. It is likewise unnecessary to pass upon this issue.

The questions to be decided are: (1) Was there a labor dispute between the parties within the meaning of the statute? (2) If so, did the trial court err in refusing to enjoin the picketing?

In our consideration of these questions we have again examined all of the decisions of this court involving the application of the labor disputes act of 1933 (Rem. Rev. Stat. (Sup.), § 7612-1 *et seq.*)—some twenty in number. Most of them were reviewed in *Gazzam v. Building Service Employees International Union,* 29 Wn. (2d) 488, 188 P. (2d) 97, where it was pointed out that discrepancies had crept into our decisions on the subject. Reference is also made to *Hanke v. Teamsters' Union,* 33 Wn. (2d) 646, 207 P. (2d) 206, where these decisions are again commented upon by the court (see page 654).

In answering the first question noted, we must have in mind the definition of a labor dispute adopted by the legislature in § 7612-13 (a) of Rem. Rev. Stat. (Sup.), which is as follows:

"A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; *whether such dispute is* (1) *between one or more employers* or associations of employers *and one or more employees* or associations of employees; (2) between one or more employers or associations of employers and one or more employers or association of employers; or (3) between one or more employees or association of employees and one or more employees or association of employees; or when the case involves any conflicting or competing interests in a 'labor dispute' (as hereinafter defined) of 'persons participating or interested' therein (as hereinafter defined)." (Italics ours.)

Appellant vigorously contends that there was no labor dispute because only one employee (out of an average of 25 employees) belonged to the union. He argues that the doctrine of the *Gazzam* case, *supra,* applies here.

In the cited case *no* employee belonged to the picketing union, and this court held that the purpose of the picketing was to compel the employer to enter into a contract which would result in his employees having to join the union. The decision of this court enjoining the picketing was affirmed by the supreme court of the United States May 8, 1950 (339 U. S. 532, 70 S. Ct. 784).

■ Since the legislature in defining a labor dispute specifically included a controversy between one or more employers and one or more employees, the courts are bound to recognize the difference between a situation where there is one employee who is a member of the picketing union and where there is no employee who belongs to such union.

We accordingly hold that this case involves a labor dispute within the meaning of the statute.

Appellant contends that there was no employer-employee relationship existing at the time Kreiger began picketing. We have examined the evidence bearing on this contention and find it to be without merit.

■ The remaining question (Should the trial court have enjoined the picketing?) presents a difficult problem. A concise statement of the applicable rule is found in *Swenson v. Seattle Central Labor Council*, 27 Wn. (2d) 193, 206, 177 P. (2d) 873, 880, 170 A. L. R. 1082, where we said:

"The United States supreme court has, by these cases, established this rule: peaceful picketing is an exercise of the right of free speech. Organized labor has the right to communicate its views either by word of mouth or by the use of placards. This is nothing more nor less than a method of persuasion. But when picketing ceases to be used for the purpose of persuasion—just the minute it steps over the line from persuasion to coercion—it loses the protection of the constitutional guaranty of free speech, and a person or persons injured by its acts may apply to a court of equity for relief."

The difficulty in applying this rule to the facts of the present case lies in attempting to draw the line between persuasion and coercion.

Here, respondent union was picketing appellant's establishment for the purpose of advising the public that he refused to pay union wages and in the hope that his employees might be persuaded to join the A. F. of L. unions. To this extent its purpose was persuasive.

However, the contracts, if signed by appellant and performed by him, would have had a directly coercive effect upon his nonunion employees. The following clauses are contained in the typewritten form of agreement submitted by respondent union to appellant:

"SECOND: All drivers, driver helpers, or solicitors working in whole or part time shall be members of Local Union No. 566, in good standing. No laundry or dry cleaning will be accepted from any driver, laundry, dry cleaner, or press shop that is not in good standing with Local Union No. 566. . . ."

"EIGHT: . . .

*All services rendered by the Party of the First Part* [appellant] *to the public,* and/or *for resale, must be performed by members of the Laundry Workers' and Dry Cleaners' Local Union No. 24, A. F. of L. in good standing,* [Italics ours] for their jurisdiction of cleaning, renovating and/or dyeing or processing, *and the pick-up and delivery*

*of all work shall be done only by members of Laundry and Dye Works Drivers' Local Union No. 566. This includes work sent out by the employer to other firms."*

Mr. Alexandrof, the business representative of respondent union, testified on cross-examination as follows:

"Q. To your knowledge a union driver could not be a member of your union and handle non-union processed goods, could he? A. No, sir; but that wouldn't compel the other people to join the union. Q. They would have to join or quit work? A. Depending on the type of contract. Q. If contract, exhibit '1', is signed, does that not force every other employee in the Ostroff establishments to either quit work or become a member of a union? A. If it becomes a union shop all employees must be members of a union, or they can be replaced by members of a union. Q. I want your unequivocal answer. A. I just told you. Q. I want a yes or no answer to a matter as vital as this. Every employee must become a member of some union, is that not correct? Yes/or no. A. They can become a member of a union or work in a non-union shop. Q. But they would have to leave this shop? A. If the contract is signed? Q. Yes. A. Yes, sir; they can leave the shop. Q. They can join a union or quit their job? A. They can leave the job. They don't have to join a union. Q. Yes. They can either starve to death or meet your condition? A. That is not the only job in the City of Seattle or in the State of Washington. Q. But you have testified you control 88%, or some such figure, of the cleaning plants in town? A. Better than 90%. Q. And for a man who wants to work in that line of work, if this shop is unionized it gives you up to probably 95%? A. Yes, sir; perhaps. Q. And his field of operation, if he wants to live in Seattle, is narrowed down to a very narrow field, isn't it? A. In Seattle, yes, sir. Q. And a man has to join the union or leave and get out of Seattle to find a job? That is what you are attempting to do? A. It depends on what kind of a job it is. Q. A man doesn't work for 20 years as a bricklayer and then become a carpenter overnight? A. There are other non-union concerns. Q. But these employees have a choice of quitting or joining your union if Mr. Ostroff signs this contract, they are compelled to join your union? A. No, sir. Q. They can either join or quit their jobs? MR. BASSETT: He is arguing with the witness. THE COURT: The objection is overruled. Q. They

are compelled to join the union or quit? A. That is about the size of it."

This testimony must be considered in the light of the public policy of the state of Washington, as declared by the legislature in Rem. Rev. Stat. (Sup.), § 7612-2, reading as follows:

"In the interpretation of this act and in determining the jurisdiction and authority of the courts of the State of Washington, as such jurisdiction and authority are herein defined and limited, the public policy of the State of Washington is hereby declared as follows:

"Whereas, Under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protections; therefore, the following definitions of, and limitations upon, the jurisdiction and authority of the courts of the State of Washington are hereby enacted."

Respondent union contends that the contracts were submitted to appellant as a starting point for negotiations and that the clauses above quoted (even if having the incidental effect of inducing appellant's employees other than Kreiger to join respondent union) do not warrant the court in enjoining the picketing. We are convinced that Mr. Alexandrof's testimony clearly demonstrates that the effect of appellant's signing the contracts would be directly, and not incidentally, to coerce appellant's employees to join the union or lose their jobs.

Respondent union's argument that in peacefully picketing appellant's business establishment the members of the union are exercising their constitutional right of free speech is answered by the supreme court of the United States in *Building Service Employees International Union, Local 262, v. Gazzam*, 339 U. S. 532, 70 S. Ct. 784 (above referred to). While in that case no member of the picketing union was in the employ of Mr. Gazzam, the court upheld the labor disputes act of this state as not violative of the first and fourteenth amendments to the Federal constitution. The question for decision was stated by the court in the following language:

"It is the public policy of the State of Washington that employers shall not coerce their employees' choice of representatives for purposes of collective bargaining. Do the First and Fourteenth Amendments to the Federal Constitution permit the State, in reliance on this policy, to enjoin peaceful picketing carried on for the purpose of compelling an employer to sign a contract with a labor union which coerces his employees' choice of bargaining representative?"

The court answered this question in the affirmative, seven of the eight justices present concurring in this statement:

"The State of Washington has by legislative enactment declared its public policy on the subject of organization of workers for bargaining purposes. The pertinent part of this statute is set forth in the margin. The meaning and effect of this declaration of policy is found in its application by the highest court of the State to the concrete facts of the instant case. Under the so-enunciated public policy of Washington, it is clear that workers shall be free to join or not to join a union, and that they shall be free from the coercion, interference, or restraint of *employers of labor* in the designation of their representatives for collective bargaining. Picketing of an employer to compel him to coerce his employees' choice of a bargaining representative is an attempt to induce a transgression of this policy, and the State here restrained the advocates of such transgression from further action with like aim. To judge the wisdom of such policy is not for us; ours is but to determine whether a restraint of picketing in reliance on the policy is an unwarranted encroachment upon rights protected from State abridgement by the Fourteenth Amendment."

This decision emphasized the right of the state to adopt the policy expressed in our labor disputes act and contained an observation which is particularly pertinent to the facts of the present case:

"Here, as in *Giboney* [*Giboney v. Empire Storage & Ice Co.*, 336 U. S. 490, 69 S. Ct. 684], the union was using its economic power with that of its allies to compel respondent to abide by union policy rather than by the declared policy of the State. That state policy guarantees workers free choice of representatives for bargaining purposes. *If respondent had complied with petitioners' demands and had signed one of the tendered contracts and lived up to its terms, he would have thereby coerced his employees.* The employees would have had no free choice as to whether they wished to organize or what union would be their representative.

"The public policy of Washington relied upon by the courts below to sustain this injunction is an important and widely accepted one. The broad purpose of the Act from which this policy flows was to prevent unreasonable judicial interference with legitimate objectives of workers. But abuse by workers or organizations of workers of the declared public policy of such an Act is no more to be condoned than violation of prohibitions against judicial interference with certain activities of workers. We therefore find no unwarranted restraint of picketing here. The injunction granted was tailored to prevent a specific violation of an important state law. The decree was limited to the wrong being perpetrated, namely, 'an abusive exercise of the right to picket.' *Cafeteria Employees Union v. Angelos*, 320 U. S. at 295, [64 S. Ct. at page 127, 88 L. Ed. 58]. The judgment is affirmed." (Italics ours.)

Respondent attempts to distinguish this case by pointing out that our statute does not forbid coercion of one or more employees by his fellow employees. However, it does prohibit such coercion by an employer whether acting voluntarily or through coercive action on the part of other employees.

We have not overlooked the cases of *Marvel Baking Co. v. Teamsters' Union Local No. 524*, 5 Wn. (2d) 346, 105 P. (2d) 46, and *Berger v. Sailors Union of the Pacific*, 29 Wn. (2d) 810, 189 P. (2d) 473, cited by respondent in justification of its right to picket in this case. The first decision

mentioned involved the breach of a contract between the union (representing all employees) and the employer. It is not in point here. In the second case, the decision does not indicate that any of the employees objected to unionization of the ship. No coercion was involved.

Viewing the evidence in this case realistically, we are constrained to hold that the picketing of appellant's business establishment by respondent union was coercive and not merely persuasive.

The judgment of the trial court is reversed with instructions to enjoin such picketing. If, at any time, the coercive features of the picketing (as herein described) are eliminated, respondent union may move the trial court for a dissolution of such injunction.

BEALS, SCHWELLENBACH, HILL, and ROBINSON, JJ., concur.

MALLERY, J., dissents.

GRADY, J. (dissenting)—I am unable to concur in the conclusion reached in the majority opinion in view of the finding made that a labor dispute existed between the appellant and the union. The theory of *Gazzam v. Building Service Employees International Union*, 29 Wn. (2d) 488, 188 P. (2d) 97; *Hanke v. Teamsters' Union*, 33 Wn. (2d) 646, 207 P. (2d) 206, and *Cline v. Automobile Drivers & Demonstrators Local Union*, 33 Wn. (2d) 666, 207 P. (2d) 216, as I read those cases, is that a union may not picket a place of business where no labor dispute exists for the purpose of coercing the owner by the use of economic pressure to conduct his business during certain hours or days of the week, or to join such union or to require his employees to do so. The reasoning of those cases would indicate that if there had existed labor disputes between the owners of the business and the unions, then if the picketing was peaceful and without intimidation of any one it would not have been enjoined. In balancing conflicting constitutional rights the existence or nonexistence of a labor dispute is not only persuasive to a court of equity, but in many instances can well be regarded as controlling. When there

is a labor dispute there may be a legal justification for picketing where none would exist if there was no such dispute. In this case, the primary dispute seems to be whether the employer should sign a contract with the union which, in effect, would result in his nonunion employees being either required to join the union or seek employment elsewhere. The presence of a picket in all probability induced the falling off of appellant's patronage and caused union drivers of trucks to refrain from making deliveries through the picket line. However, I do not think it can be said that we have ever decided it to be the public policy of this state that if there exists a labor dispute and such results incidentally flow from peaceful picketing it goes beyond the right of free speech and must be enjoined. This I believe is the effect of the majority opinion, and if carried to its logical conclusion all picketing might be said to be unlawful if its effect was to bring to bear any economic pressure upon the employer to meet the demands of a union in upholding its side of a labor dispute between itself and an employer. I think the guaranty of free speech as defined by the United States supreme court in labor cases does not permit this court to go that far.

The judgment should be affirmed.

HAMLEY, J. (dissenting)—The trial court dismissed the complaint upon the ground that, since a "labor dispute" was involved, the court was deprived of power to enjoin the picketing because of the provisions of the labor disputes act of 1933. The provision of that act which the court apparently had in mind is § 4 (e) (Rem. Rev. Stat. (Sup.), § 7612-4 (e) [P.P.C. § 695-7]). It is there provided that no court of this state shall have jurisdiction to issue an injunction for the purpose of prohibiting picketing, except where fraud or violence is shown, in any case involving or growing out of any labor dispute.

Since *Blanchard v. Golden Age Brewing Co.*, 188 Wash. 396, 63 P. (2d) 397, this statutory prohibition against the issuance of injunctions has not been considered as binding upon the courts. The *Blanchard* decision expressly invali-

dated only §§ 7, 8 and 9 of the labor disputes act (Rem. Rev. Stat. (Sup.), §§ 7612-7, 7612-8, 7612-9 [P.P.C. § 695-13, -15, -17]). But it has been generally recognized that the reasoning of the opinion applies with equal force and effect to § 4 (e). The essence of that reasoning is that legislation abolishing or abridging the power of courts to issue injunctions contravenes provisions of the state constitution investing all judicial power in the courts. Since the *Blanchard* decision, efforts to resist picketing injunctions have usually been grounded upon general considerations of equity or upon the free speech guarantee of the Federal constitution.

The trial court was therefore in error in considering that it was bound by statute to dismiss the complaint, and in failing to exercise its discretion as a court of equity. The case is before us *de novo*. It is now for us to decide whether, in the exercise of a sound discretion, the relief prayed for ought to be granted. The question before us is not how far we have a constitutional right to go, but how far, in equity and good conscience, we ought to go.

The majority has properly turned to the labor disputes act for guidance in reaching a just result. This act, though abortive for constitutional reasons in so far as it purports to limit judicial power, nevertheless represents the considered opinion of the people respecting the correlative rights of employers and employees in these situations. It was enacted in 1933, and has never been amended. It carries added weight, as an expression of policy, by reason of the fact that similar acts have been enacted in many states. All of these state statutes stem from the Federal Norris-LaGuardia act, enacted in 1932. 47 Stat. 70, 29 U. S. C. A., §§ 101-115.

I feel, however, that the majority should not have limited its consideration of that act to § 2 (Rem. Rev. Stat. (Sup.), § 7612-2 [P.P.C. § 695-3]). The majority opinion is made to turn entirely upon the conclusion that the picketing was for the purpose of having the employer coerce his employees into joining the union, contrary to certain provisions of § 2.

In my view, the basic policy of the labor disputes act is

not the disapproval of closed shop agreements. That declaration is incidental to, and in my opinion qualified by, the primary objective of permitting employees, while engaged in a labor dispute, to wage their economic contest free from judicial interference, so long as fraud and violence are avoided. This basic policy is expressed and developed throughout the act. See, Labor Disputes and Collective Bargaining, Ludwig Teller, vol. 1, § 199, pages 586-588; Senate Report No. 163, 72nd Congress, 1st Session, February 4, 1932; House of Representatives Report No. 669, 72nd Congress, 1st Session, March 2, 1932; 15 Wash. L. Rev., pages 47-53.

In past cases of this kind it has been our practice to first determine whether there was involved a "labor dispute" within the meaning of the act. Where no labor dispute was found to exist, we have given paramount consideration to the anti-coercion declarations of § 2, and have frequently granted an injunction. See, *Fornili v. Auto Mechanics' Union Local No. 297*, 200 Wash. 283, 93 P. (2d) 422; *United Union Brewing Co. v. Beck*, 200 Wash. 474, 93 P. (2d) 772; *Shively v. Garage Employees Local Union No. 44*, 6 Wn. (2d) 560, 108 P. (2d) 354; *Swenson v. Seattle Central Labor Council*, 27 Wn. (2d) 193, 177 P. (2d) 873; *Gazzam v. Building Service Employees International Union*, 29 Wn. (2d) 488, 188 P. (2d) 97; *Hanke v. Teamsters' Union*, 33 Wn. (2d) 646, 207 P. (2d) 206; *Pacific Nav. & Trading v. National Organization of Masters, etc.*, 33 Wn. (2d) 675, 207 P. (2d) 221.

However, where a labor dispute was found to exist, we have uniformly denied injunctions unless there was a showing of fraud or violence. *Marvel Baking Co. v. Teamsters' Union Local No. 524*, 5 Wn. (2d) 346, 105 P. (2d) 46; *Weyerhaeuser Tbr. Co. v. Everett Dist. Council of Lbr. & Sawmill Workers, etc.*, 11 Wn. (2d) 503, 119 P. (2d) 643; *Berger v. Sailors Union of the Pacific*, 29 Wn. (2d) 810, 189 P. (2d) 473; *Wright v. Teamsters' Union Local No. 690*, 33 Wn. (2d) 905, 207 P. (2d) 662.

A review of the cited cases indicates that our only purpose in making this determination as to the existence of a "labor dispute" has been to learn whether it would be necessary to consider the anti-injunction policy of the act. As we have seen, that policy applies only where a labor dispute is involved.

We did consider that policy, and refused to grant an injunction, in *Berger v. Sailors Union of the Pacific, supra,* on facts very similar to those here developed. We there said, at page 813:

"The facts recited above establish the existence of a labor dispute, hence injunction will not lie to prohibit respondent labor union and its members from peacefully picketing appellants' motorship Garland for the purpose of completely unionizing that vessel's crew, of which four were members of the union. Rem. Rev. Stat. (Sup.), § 7612-1 [P.P.C. § 695-1] *et seq.*"

The majority distinguishes the *Berger* case by saying that the decision in that case does not indicate that any of the employees objected to unionization of the ship, and that "no coercion was involved." I do not see how we can draw that conclusion, inasmuch as thirteen of those employees joined the employer as parties plaintiff in that injunction suit.

Once we disregard the "labor dispute" line of demarkation, specified in the statute and heretofore respected by this court, we are sailing on uncharted seas. In this case coercion was found where only one employee had union membership, though he represented one hundred per cent of the company's truck drivers. What will be our attitude when there are two employees, or a majority, or all but one, who are members of the union? Here the one union member did not divulge his membership to his employer prior to the strike. Will it make any difference if such membership is known to the employer for a long period of time? The proposed agreement was for a closed shop. Will we find that a union shop agreement is also coercive, as we did in the *Gazzam* case, where no labor dispute was involved? In the instant case the employees (except for Kreiger and one

employee on vacation) unanimously indicated their objection to unionization by signing a statement to that effect shortly after picketing began. What if there is no written record of such objection, or if it is delayed until the strike has long been in progress, or if less than all of the employees object? How far will we inquire into charges that employee objections to unionization resulted from undue influence exerted by employers?

It is not sufficient to say that we will meet these problems when they arise. The point is that we ought not, except for most urgent reasons, launch upon a course which opens up whole new fields of litigation—fields in which we will have to improvise guideposts and principles as we go along. It has taken us from 1933 until the present time to develop the relatively well-established and generally understood principles which today govern in these cases. How many years it will now take to resettle the law must be left to the imagination.

The proposed contract here in question is a "package" containing many features besides the closed shop. It calls for higher wages, decreased hours, and other changes in working conditions. The majority makes it clear that picketing to attain these objectives would not be enjoined. The opinion provides that if the closed shop features of the contract is abandoned, the injunction may be dissolved.

Is this not placing the burden in the wrong place, even assuming that picketing for the purpose of obtaining a closed shop agreement should be enjoined where a labor dispute is involved? If any purpose of the picketing is lawful and not enjoinable, I would think that we ought not to issue the injunction. Moreover, the mere proposal for a closed shop agreement, as distinguished from picketing to attain a closed shop, is not unlawful even under the majority opinion. Why, then, should the withdrawal of such proposal be made a condition precedent to the enjoyment of the right to picket peacefully for "noncoercive" objectives?

It seems to me that the burden should be placed upon the employer, who seeks the injunction, to show that there is

no labor dispute regarding wages, hours of labor, working conditions, or any other noncoercive subject, before he is entitled to stop the picketing. If the employer is willing to meet the union demands in these respects, then the picketing would relate only to the closed shop proposal and would be for a "coercive" purpose (as the majority uses that term); otherwise not.

This suggestion accords with the disposition we made of *Kimbel v. Lumber & Saw Mill Workers Union*, 189 Wash. 416, 65 P. (2d) 1066. That case involved a "labor dispute" within the meaning of the act. The employer claimed that the purpose of the strike was to compel him to sign a contract recognizing the union, and to require him to coerce his employees into joining the union. In denying the injunction, we said, at page 419:

"It appears from the evidence, as stated by the trial court in its memorandum opinion, that at least one of the reasons that the union men who were working for appellant were called out was on account of the low wage scale paid by appellant."

I dissent.

---

March 1, 1951. Petition for rehearing denied.