[No. 32052.   Department One.   August 21, 1952.]

ISTHMIAN STEAMSHIP COMPANY *et al., Respondents,* v. NA-
TIONAL MARINE ENGINEERS' BENEFICIAL ASSOCIATION
*et al., Appellants,* BROTHERHOOD OF MARINE
ENGINEERS *et al., Respondents.*[1]

[1]Reported in 247 P. (2d) 549.

*Houghton, Cluck, Coughlin & Henry* and *Paul Coughlin,* for appellants.

*Grosscup, Ambler & Stephan, John Ambler,* and *Pendleton Miller,* for respondents Isthmian Steamship Company *et al.*

*Bassett, Geisness & Vance,* for respondents Brotherhood of Marine Engineers *et al.*

DONWORTH, J.—On November 30, 1951, plaintiffs brought this action to enjoin defendants' picketing of the Steamship Las Vegas Victory, a vessel operated by the Isthmian Steamship Company (herein called Isthmian). Plaintiff A. R. Smith & Co. was a consignee of cargo aboard the Las Vegas Victory. The court on that date entered an order directing defendants to appear and show cause why an injunction *pendente lite* should not issue.

Prior to the hearing on the order to show cause, interveners, the Brotherhood of Marine Engineers (herein called the Brotherhood), a labor union affiliated with the American Federation of Labor, and the five marine engineers aboard the Las Vegas Victory, members of the Brotherhood, were granted leave to intervene. The Brotherhood alleged that it was the exclusive bargaining representative for all licensed marine engineers employed by Isthmian and prayed that defendants' picketing of the Las Vegas Victory be enjoined.

Affidavits were filed by Isthmian and the defendants, and a hearing was held thereon December 6 and 7, 1951; no oral testimony was taken. On December 8th, the court entered findings of fact, conclusions of law, and a temporary injunction, enjoining the picketing *pendente lite*. Defendants have appealed.

The background of this dispute, in so far as it can be gathered from the complaints and the affidavits filed, appears to be as follows:

Isthmian is a Delaware corporation engaged in the business of operating vessels in interstate and foreign commerce. Defendant National Marine Engineers' Beneficial Association (herein called MEBA) is a labor union affiliated with the Congress of Industrial Organizations. The other defendants include the local MEBA organization, its officers and members, and the national president of MEBA.

In 1938, MEBA was certified by the national labor relations board as the sole collective bargaining agency for all licensed marine engineers employed by Isthmian on its vessels, and Isthmian so recognized MEBA until July 15, 1951. Licensed marine engineers are supervisory personnel. In 1947, the labor management relations act, 61 Stat. 136, 29 U. S. C. A. §§ 141 *et seq.*, was enacted by Congress. This act excluded supervisory personnel from the scope of any law, either national or local, relating to collective bargaining. There has been, therefore, since 1947, no statutory procedure for determination of the collective bargaining representative of licensed marine engineers.

Nevertheless, Isthmian, subsequent to 1947, negotiated with MEBA contracts pertaining to the terms and conditions of employment of its licensed marine engineers. In the spring of 1950, after an oral claim by the Brotherhood that it represented a majority of the marine engineers employed by Isthmian, the company conducted a poll of its engineers. The result of the poll was that about thirty per cent favored the Brotherhood, while a majority favored MEBA.

Isthmian thereafter negotiated another contract with MEBA for a term expiring July 15, 1951. In May, 1951, negotiations were commenced between Isthmian and MEBA for a new contract to take effect upon expiration of the existing contract. MEBA included within its proposed contract provisions which Isthmian refused to accept on the ground that they would establish a union hiring hall and a closed shop. The trial court found that the proposed contract did contain closed shop and hiring hall provisions.

Appellants complain of this finding, but in our view of the case it is not necessary for us to determine the nature of the contract, and we shall assume, for the purpose of this opinion, that it did provide for a closed shop and a hiring hall.

At about the time negotiations between Isthmian and MEBA were commenced in May, 1951, the Brotherhood again claimed the right to be the bargaining agent for Isthmian marine engineers and demanded that Isthmian negotiate with it. Notwithstanding this demand of the Brotherhood, Isthmian continued negotiations with MEBA until they were terminated by reason of the parties' inability to agree upon the MEBA demand for the hiring hall and closed shop provisions.

On July 16, 1951, MEBA called a strike for the purpose of obtaining execution of its proposed contract by Isthmian and notified its members aboard Isthmian vessels to leave their ships. According to one of appellants' affidavits, a total of 114 out of 148 marine engineers aboard Isthmian vessels, which had ended their voyages since the strike was called, had responded to the MEBA strike call. According to Isthmian's affidavits, only 72 out of 175 or 181 Isthmian engineers had left Isthmian vessels as a result of the strike or for other reasons unknown to Isthmian.

The Brotherhood, on August 2, 1951, again demanded that Isthmian negotiate with it. Isthmian requested proof of the Brotherhood's claim that it represented a majority of its licensed engineers, and on August 16th and 17th a count of Brotherhood pledge cards was taken by Isthmian, which, according to Isthmian's affidavit, showed that 128 out of 204 marine engineers then employed by it had signed Brotherhood pledge cards. Isthmian thereupon entered into negotiations with the Brotherhood which resulted in their execution of a contract dated August 18, 1951.

The Isthmian vessel Las Vegas Victory docked at pier 57 in Seattle November 19, 1951. Shortly after its arrival, pickets identifying themselves by armbands as "MEBA Pickets" patrolled in front of the gate leading to pier 57. Longshoremen employed by Isthmian's contract stevedore,

Rothschild-International Stevedoring Company, declined to cross the picket line, and unloading and loading of the vessel was necessarily halted. This action was brought as a result of that picketing.

Appellants have made several assignments of error, but discuss them together in their brief for the stated reason that they all present the same general question. The briefs of all three parties discuss many matters that will undoubtedly have to be decided by the superior court when this case is tried on the merits. We shall not prejudge these questions but shall confine our decision to the sole question of whether, on the present record, the trial court abused its discretion in granting the temporary injunction.

We, therefore, set out the material portions of the findings:

"3. On July 16, 1951, the MEBA called a strike to require and induce Isthmian to enter into a certain labor agreement containing closed shop and hiring hall provisions applicable to licensed marine engineers. Licensed marine engineers are supervisors.

"4. Prior to July 16, 1951, all of the Isthmian vessels' licensed marine engineers, belonged to the MEBA. In a poll conducted in the spring of 1950, 65 Isthmian engineers indicated a preference to be represented by the BME (AFL). This was a minority of the engineers, and Isthmian continued to deal with the MEBA. In May, 1951, and August, 1951, the BME again made written demands that Isthmian bargain with BME, as representative of the engineers, and on August 16 and 17, 1951, Isthmian and BME conducted a pledge card check. This check showed the Isthmian Co. claimed that a majority of the licensed marine engineers then employed on Isthmian vessels had authorized the BME to represent them.

"5. On August 18th, 1951, Isthmian entered into a written collective bargaining agreement with plaintiff in intervention, BME, covering licensed marine engineers employed by Isthmian. Said agreement, as amended on October 31, 1951, is now in full force and effect.

"6. Some of the Isthmian engineers went on strike and some did not go on strike. Those who did go on strike were replaced. The Isthmian vessels have continued to operate with some interruptions.

"7. Both BME and MEBA demand control of the jobs of licensed marine engineers on Isthmian vessels.

"8. The LAS VEGAS VICTORY is the only Isthmian vessel in the State of Washington. All of the engineers aboard the LAS VEGAS VICTORY are members of the BME and parties to the complaint in intervention. All the engineers employed on the ship left the job when the strike was called in response to the MEBA strike call.

"9. All of the members of the crew of the LAS VEGAS VICTORY are parties to Shipping Articles entered into under the laws of the United States. The picketing has caused longshoremen employed in the regular course of business by Rothschild-International Stevedoring Company to refuse to handle cargo aboard the said vessel. Rothschild-International Stevedoring Company has no labor dispute with MEBA.

"10. The acts of the defendants are resulting in continuing and irreparable damage and injury, and it will be extremely difficult to ascertain the amount of compensation which would afford adequate relief if the acts of the defendants are permitted to continue."

The temporary injunction enjoined appellants, *pendente lite,* from picketing Isthmian vessels in this state, including the Las Vegas Victory, and from combining or conspiring with any other persons to interfere for certain coercive purposes with the operations of Isthmian vessels in this state.

Appellants' principal arguments may be summed up as follows:

1. Appellants have a right to picket peacefully in connection with their strike, which right cannot be denied to them by court injunction.

2. The closed shop is a lawful object for a strike and picketing by appellants.

3. Isthmian objected to the proposed MEBA contract on the ground that it would require a "closed shop," but Isthmian thereafter negotiated a closed shop contract with the Brotherhood and is therefore in no position to apply for equitable relief.

The order appealed from grants an injunction *pendente lite,* which was issued after a hearing upon affidavits only; no testimony was taken, and, of course, none of the affiants was subjected to cross-examination. The affidavits are

conflicting on several material issues of fact. We cannot determine now what evidence might be produced upon the trial after issue has been joined. Determination of the questions which appellants attempt to raise at this time may or may not be necessary to a final decision after a trial on the merits. Under such circumstances, we decline to express any opinion upon these questions, except in so far as it is necessary to do so in discussing respondents' argument in support of the temporary injunction.

Respondents' arguments may be summarized as follows:

1. Picketing for a closed shop is against the public policy of this state.

2. There was no labor dispute between Isthmian and MEBA, and in the absence thereof, the picketing was unlawful.

3. Picketing to coerce Isthmian to breach a valid agreement (Isthmian-Brotherhood contract of August 18, 1951) is against the public policy of this state and therefore unlawful.

4. The picketing was secondary in its nature and therefore unlawful in that it was designed to cause Isthmian seamen to breach their shipping articles and longshoremen to refuse to work Isthmian cargo.

5. Courts of this state will enjoin picketing which is conducted in contravention of public policy.

As heretofore pointed out, the trial court refused to find that the Brotherhood represented a majority of the licensed engineers employed by Isthmian on August 16 and 17, 1951, but found that Isthmian *claimed* that a majority had authorized the Brotherhood to represent them.

Because this pivotal issue of fact is left undetermined, we must hold that the trial court abused its discretion in enjoining appellants from picketing *pendente lite* unless, as respondents contend, the picketing was for an unlawful purpose.

Respondents rely principally upon our two recent decisions in *Ostroff v. Laundry & Dye Works Drivers' Local No. 566*, 37 Wn. (2d) 595, 225 P. (2d) 419, and 39 Wn. (2d) 693, 237 P. (2d) 784. In that case, one employee, who joined

a union without the knowledge of his employer or his fellow workers, struck and, with members of his union who were never employed by the employer, picketed the employer's plants to induce him to sign a contract. The effect of entering into the contract would have been to compel the employer to coerce some twenty-five other employees (all of whom had signed a statement that they did not wish to join any union) to either join this union or lose their jobs.

The present case involves not only a labor dispute between Isthmian and MEBA but a contest between the two unions as to which has the right to represent Isthmian's licensed marine engineers as their collective bargaining agent. No employees have protested that either the proposed MEBA contract or the Brotherhood contract will have the effect of compelling Isthmian to coerce them into joining either union. The *Ostroff* decisions are inapplicable to the present case so far as the record now before us discloses.

In *Yeager v. International Brotherhood of Teamsters, Chauffers, Warehousemen & Helpers of America, Local 313,* 39 Wn. (2d) 807, 239 P. (2d) 318, we upheld a closed shop contract voluntarily entered into between an employer-operator member of the union and the union even though its effect was to prevent the subsequent employment of a nonunion driver. In so holding, we said:

"In substance, the by-laws in question constituted a closed shop agreement, effective while appellant was a member of the union. It was an agreement entered into voluntarily by appellant at a time when he employed only union members. Contracts of this kind are commonplace and not unlawful under the laws of this state. The only statutory provision which has any possible bearing on this is the declaration of policy contained in the labor disputes act of 1933, referred to above. This policy declaration has never been held to prohibit closed shop agreements entered into voluntarily and exerting no compulsion upon the then employees of the contracting employer. On the contrary, a contract of this kind was recognized and given effect by this court in *Marvel Baking Co. v. Teamsters' Union, etc.,* 5 Wn. (2d) 346, 105 P. (2d) 46. See, also, *Edwards v. Teamsters Local Union No. 313,* 8 Wn. (2d) 492, 113 P. (2d) 28.

"*Gazzam v. Building Service Employees Int. Union, Local 262,* 29 Wn. (2d) 488, 188 P. (2d) 97, 34 Wn. (2d) 38, 207 P. (2d) 699, 339 U. S. 532, and *Ostroff v. Laundry & Dye Works Drivers' Local No. 566,* 37 Wn. (2d) 595, 225 P. (2d) 419, cited by appellant, are not in point. In neither of these cases was the union seeking to enforce a closed shop agreement voluntarily entered into by the employer. *Blanchard v. Golden Age Brewing Co.,* 188 Wash. 396, 63 P. (2d) 397, is likewise inapplicable. There the employer and the picketing union were seeking to coerce the employees to discontinue their affiliation with one union and join another."

We, therefore, conclude that the picketing in support of MEBA's contract demands, so far as appears from the trial court's findings, was not made unlawful by reason of the closed shop and hiring hall provisions.

██ Again confining ourselves to the record before us, we are of the opinion that the trial court was correct in concluding that there is a labor dispute existing between MEBA and its members and Isthmian. The members of appellant unions were employees of Isthmian when they struck on July 16, 1951, to induce the company to sign the proposed contract. There is nothing in the record to show that their status has changed since then. The acts of Isthmian in hiring others to replace them and entering into a collective bargaining contract with a rival union, which has not been proved to represent a majority of the marine engineers, do not cut off their right to picket peacefully as striking employees.

Respondents cite *National Labor Relations Board v. Mackay Radio & Telegraph Co.,* 304 U. S. 333, 82 L. Ed. 1381, 58 S. Ct. 904; and *National Labor Relations Board v. Sands Mfg. Co.,* 306 U. S. 332, 83 L. Ed. 682, 59 S. Ct. 508, as authority for a contrary holding. These cases do not involve picketing and construe the national labor relations act, from the operation of which Isthmian's licensed marine engineers are exempt.

██ As to when an employee, who is out on strike, ceases to be such, our second decision in the *Ostroff* case, *supra,* is in point. In holding that a labor dispute still existed,

although the former employee had discontinued picketing and had worked for various employers since then, we said:

"The trial court found that Kreiger discontinued his picketing duties against the appellant in July, 1950, and has worked for various other employers since that time; that he is not now actively employed through the respondent union and has not been since July, 1950.

"Evidence introduced by respondent discloses that Kreiger is still one of its members and eligible to go to work as such.

"The trial court found from the evidence that the labor dispute between the parties has at all times continued and still exists. Considering these facts and the established law of this case, we agree with that conclusion.

"No precedent in point has been cited to us by counsel nor have we found any. It seems logical to us that discontinuance by Kreiger of his activities as a picket or his employment elsewhere does not necessarily terminate his relationship with appellant for the purposes of this case. He was an employee of the appellant when the dispute arose. To hold that a change in his status sufficient to affect the rights of the parties to this action has occurred, would be to hold that such events as the discharge of an employee, or his taking work elsewhere pending a labor dispute, would necessarily terminate the relationship upon which the finding of a labor dispute is based. It would follow, from such a holding, that an employer, by many conceivable acts, such as the prompt discharge of an employee or the prolongation of the dispute until economic necessity forced the employee to seek work elswhere, could place himself in the position of having no union employees; consequently, no labor dispute. This does not appear to us to be equitable."

It is respondents' position that since, at the time the Las Vegas Victory entered a port within this state, all engineers aboard were members of the Brotherhood, there could be no labor dispute entitling MEBA to picket the vessel. Respondents state in their brief that

"Appellant's contention on this point amounts to an argument that every ship . . . which comes into Washington brings with it the accumulated disputes of its owner's prior history in other jurisdictions."

Assuming this to be a fair statement of appellants' contention, we believe it to be justified under the facts of this case. For aught that appears from the record, the Las Vegas

Victory was the first Isthmian vessel to enter a port within this state subsequent to July 16, 1951. The members of appellant union on November 21, 1951, when the Las Vegas Victory arrived in Seattle, had been on strike for four months and were picketing Isthmian ships in various parts of the United States except where picketing had been enjoined.

The trial court found that a strike was called by MEBA on July 16, 1951, to enforce its contract demands; that prior to that date all Isthmian-employed engineers belonged to MEBA and that all engineers then (July 16, 1951) employed on the Las Vegas Victory had responded to the MEBA strike call.

We, therefore, hold that a labor dispute between Isthmian and MEBA existed.

*Pacific Navigation & Trading, Inc. v. National Organization of Masters, Mates & Pilots of America, West Coast Local 90,* 33 Wn. (2d) 675, 207 P. (2d) 221, relied upon by respondents, is not in point. In that case, there was only a dispute between two locals of the same union; there was no labor dispute.

We find no merit in respondents' third argument because it does not appear from the court's findings of fact that the Isthmian-Brotherhood contract is a valid agreement negotiated with a representative of the majority of Isthmian's marine engineers under such circumstances as would preclude the right of MEBA members to picket.

With reference to respondents' fourth argument, there is likewise no finding of fact upon which a conclusion could be based that the picketing was secondary in its nature and *was designed* to cause Isthmian employees aboard the vessel to breach their shipping articles or to cause longshoremen to refuse to handle cargo.

We express no opinion upon respondents' fifth argument because, so far as appears from the record, the picketing of the Las Vegas Victory was not conducted in contravention of the public policy of this state.

For the reasons hereinbefore stated, we are of the opinion that the trial court abused its discretion in granting the temporary injunction.

RCW 7.40.020 provides in part as follows:

"When it appears by the complaint that the plaintiff is entitled to the relief demanded, and the relief, or any part thereof, consists in restraining the commission or continuance of some act the commission or continuance of which during the litigation would produce great injury to the plaintiff; or when, during the litigation, it appears that the defendant is doing, or threatens, or is about to do, or is procuring, or is suffering some act to be done, in violation of the plaintiff's rights respecting the subject of the action, tending to render the judgment ineffectual;  .  .  .   an injunction *may* be granted to restrain such act or proceedings until the further order of the court, which may afterwards be dissolved or modified upon motion.  .  .  ."   (Italics ours.)

Granting or withholding of a temporary injunction is addressed to the sound discretion of the court, to be exercised according to the circumstances of the particular case. *Blanchard v. Golden Age Brewing Co.,* 188 Wash. 396, 63 P. (2d) 397.  That discretion must also be exercised within the bounds of established rules and principles of law.

"It is an established rule in this jurisdiction that it is incumbent upon one who seeks relief by temporary or permanent injunction to show a clear legal or equitable right and a well-grounded fear of immediate invasion of that right. *State ex rel. Hays v. Wilson,* 17 Wn. (2d) 670, 137 P. (2d) 105.  Furthermore, the acts complained of must establish an actual and substantial injury or an affirmative prospect thereof to the complainant. [Citing authorities.]" *King County v. Port of Seattle,* 37 Wn. (2d) 338, 223 P. (2d) 834.

There can be no question that Isthmian is threatened with substantial injury, but that threat arises from a situation which, in large measure, it helped to create. It has not thus far shown a clear legal or equitable right to have the picketing enjoined.

An injunction *pendente lite* will not issue in a doubtful case nor where the material facts in the complaint and

supporting affidavits, on which the right depends, are controverted or denied. High on Injunctions (4th ed.) 12, § 8. *Bayonne Textile Corp. v. American Federation of Silk Workers*, 116 N. J. 146, 172 Atl. 551, 92 A. L. R. 1450.

The complainant must make out a *prima facie* case. *Hansen v. Runkel*, 177 Wash. 384, 32 P. (2d) 103. Respondents have failed to do so because Isthmian has not established that it dealt with the bargaining representative of the majority of its licensed marine engineers.

When this case is tried on the merits, an entirely different situation may be found to exist depending upon the evidence then presented. Nothing said in this decision with reference to the facts is in any way binding upon the trial court when this case comes on for final hearing. At present, we are passing only upon the sufficiency of the evidence already in the record to support the temporary injunction.

The order appealed from is reversed, and the cause is remanded with instructions to dissolve the temporary injunction.

MALLERY, GRADY, HAMLEY, and WEAVER, JJ., concur.