[No. 30505.　*En Banc.*　June 24, 1949.]

F. E. Wright *et al., Appellants,* v. Teamsters' Union Local No. 690 *et al., Respondents.*[1]

[1]Reported in 207 P. (2d) 662.

*Velikanje & Velikanje* and *John S. Moore, Jr.,* for appellants.

*Bassett & Geisness,* for respondent Teamsters' Union, Local No. 690.

*L. Presley Gill,* for respondent Amalgamated Meat Cutters & Butcher Workmen of North America, Local No. 529.

ROBINSON, J.—In 1946, plaintiffs F. E. Wright and H. B. Younkers acquired a building outside of Pasco, and established the East-Side Market there. From the beginning, they sold groceries, fresh produce, and meat. At first, they and their wives operated the whole market, but, as their business grew, they found themselves unable to handle it in its entirety. In March, 1947, they brought in John Owens to operate their meat department. The defendant Meat Cutters' Union, through its agent, William Moore, approached Owens, with a view to obtaining his signature on a contract to be made with the union. According to Moore's testimony, Owens referred him to Wright. The three had several discussions. Wright refused to agree to the contract because it contained a provision prohibiting the sale of meat after six p. m. and on Sundays, and it was the policy of the entire market to remain open during those times. The matter was investigated by the Pasco-Kennewick Central Labor Council, but no settlement was reached. The union then had the East-Side Market placed on its unfair list, and from

June 19 through July 2, 1947, picketed it. In consequence of this, certain suppliers discontinued their sales to the market, the drivers of others refused to deliver goods there, and plaintiffs' business markedly declined.

On July 1st, plaintiffs filed their complaint asking for an injunction *pendente lite* against both the Meat Cutters' Union and the Teamsters' Union. The court issued a show cause order, requiring the defendants to appear at a hearing, and further issued a temporary restraining order effective pending the hearing. At this hearing, the parties stipulated that the cause should be submitted to the court for final judgment on the merits on the basis of the evidence there presented. At its conclusion, the court dissolved the restraining order and held that the plaintiffs' application for an injunction *pendente lite* should be denied and that plaintiffs' complaint should be dismissed, both as to the Meat Cutters' Union and as to the Teamsters' Union. From this decree, plaintiffs appeal, praying this court to order that a permanent injunction be issued, and that they receive a judgment for their damages.

We shall first consider appellants' rights against the Meat Cutters' Union. It is not disputed that the pickets representing this union did not attempt to confine their picketing to the meat department, but walked in front of the entire market, carrying signs stating: "This Place Unfair to Meat Cutters' Union, Local 29, American Federation of Labor." In addition, the market as a whole, rather than the meat department alone, was declared unfair. Appellants contend that an injunction should issue prohibiting the Meat Cutters from picketing or boycotting their market, first, because John Owens is not an employee of theirs, but a lessee, and in consequence appellants are mere bystanders, and not participants in the dispute; and second, because whether or not Owens is an employee, in any event he is not a union member, and therefore, under the authority of *Gazzan v. Building Service Employees Union*, 29 Wn. (2d) 488, 188 P. (2d) 97, *Swenson v. Seattle Central Labor Council*, 27 Wn. (2d) 193, 177 P. (2d) 873, 170 A. L. R. 1082, and similar cases, there is no valid labor dispute between the union and the

market which would render picketing by the union permissible.

As to the first point, the testimony showed that the arrangement obtaining between appellants and Owens was an oral lease under which Owens paid appellants two and one-half per cent of his gross sales. Owens had a separate tax certificate, issued by the state; he kept his own books; and it was alleged that he had entire control over the operation and management of the meat market. On the other hand, his lease was terminable at any time, at the option of either of the parties. Owens himself testified: "Q. If they became dissatisfied with you, they could terminate your position there? A. I think it would be that way."

But regardless of what Owens' actual position might have been, it is apparent that to the union, as well as to the public at large, the meat department was an inseparable part of the market. As with many similar establishments, the market entrance consisted of two large doors which led to all departments. To picket the meat department effectively, it was clearly necessary to picket the whole of the market as well. As the California supreme court said in *Lund v. Auto Mechanics' Union,* 16 Cal. (2d) 374, 106 P. (2d) 408:

"If the public was led to believe that the picketing was directed at the respondent's business rather than at the repair shop alone, he was as much responsible for the creation of that impression as were the appellants. Both businesses were carried on under the same roof and under the single name of 'Campus Garage' and, as the record shows, were operated without even a partition to separate them.

. . .

"Largely in substance as well as in form there was but one business unit in operation at that location."

But there is another and stronger reason why appellants could not object to the Meat Cutters' Union's proceeding against the entire market. Owens, when first approached by Moore, told him that he was an employee without authority to sign any agreements with the union. Wright was apparently present at all subsequent discus-

sions. He, rather than Owens, appears to have been the individual who was asked to sign the agreement, and he, rather than Owens, seems to have refused to sign, not on the ground that he was a third party and not involved in the dispute, but because it was the policy of the entire market to keep open during late hours and on Sundays. Whether or not he was an "employer" in every sense of the word, it is apparent that at least he determined the hours during which Owens should work. Under such a circumstance, we think that, from the union's standpoint, he was clearly an employer and that he cannot avoid the consequences of that status by relying on the device of an oral lease. See *Berger v. Sailors Union of the Pacific*, 29 Wn. (2d) 810, 189 P. (2d) 473. In that case, a similar result was reached in spite of the allegation that the master and crew of a picketed vessel were not in an employer-employee relationship, but instead were limited partners.

■ Appellants also question Owens' status as a union member. Owens first made application to join the Meat Cutters' Union November 15, 1946. He paid his initiation fees and his dues through March, 1947, making his payment of the March dues on the 26th of that month. It is apparent therefore that, at the time this dispute first arose, he was a member in good standing.

The by-laws of the International Union provide that a member who has not paid his dues by the 10th day of the second month shall stand suspended, and shall be deprived of all benefits of the Union for six months after reinstatement. When the picketing started on June 19th, more than forty days had passed since Owens had paid his dues. However, he had not attempted to withdraw from the union, and the union had taken no action against him; no formal charges had been placed against his membership. Moore stated: "He is considered a member of the union, because he has paid his dues within the past six months." We think, therefore, that mere neglect in the payment of dues did not extinguish Owens' union membership, and that at the time of the picketing, as well as at the time the dispute began, he was a union member.

■ The decisions of which the *Gazzam* and *Swenson* cases, *supra,* are the prototypes, are consequently not applicable to this situation. Those cases hold only that peaceful picketing of an employer's place of business is unlawful where the employees are not members of the picketing union, and where the purpose of the picketing is to force the employees to join the union or to compel the employer to enter into a contract which would, in effect, compel his employees to become members of the union. In the instant case, on the other hand, Owens being a union. member, the union, and where the purpose of the picketing is to force to persuade him to enter into an agreement with it whereby Owens would be working under the same conditions as other union members in the Pasco vicinity. *Berger v. Sailors Union of the Pacific, supra.*

It is incidentally noteworthy that the union's position derives a certain added equitable force from the fact that the chief reason that Wright declined to sign the agreement was that he wished the market to continue selling meat on Sundays, in spite of the fact that Rem. Rev. Stat., § 2494 [P.P.C. § 118-223], provides as follows:

"Every person who, on the first day of the week, shall . . . sell, offer or expose for sale, any personal property, shall be guilty of a misdemeanor: Provided, . . . nothing in this section shall be construed to permit the sale of uncooked meats. . . ."

The picketing was entirely peaceful. There were never more than two pickets present, and they did not molest or interfere with the customers of the market in any way. We believe that the picketing of the East-Side Market, as a whole, was entirely lawful and not subject to injunction; and that the union was further entitled to publicize its grievance against the market by any legal means available to it. *Marvel Baking Co. v. Teamsters' Union,* 5 Wn. (2d) 346, 105 P. (2d) 46; *Kimbel v. Lumber & Saw Mill Workers Union,* 189 Wash. 416, 65 P. (2d) 1066.

■ But irrespective of this, appellants contend that Meat Cutters' Union has subjected certain of their suppliers

to an unlawful secondary boycott. Their complaint alleges that this union (together with the Teamsters' Union),

". . . acting in concert and conspiracy to injure and damage plaintiffs' business, . . . have forbidden and by coercive methods will not allow any truck drivers or trucks to make deliveries to plaintiffs' place of business and have gone to the suppliers of plaintiffs and by coercive methods and threats have ordered said suppliers and distributors to refuse to make deliveries to plaintiffs even at their warehouse, with a threat that if deliveries are made union action will be instituted against said suppliers and distributors. That said acts are not done by persuasion, but are done under threat and coercion. . . ."

Had these allegations been proved, they would more than suffice to show an illegal secondary boycott. In defining the term "secondary boycott," we have said:

"While the term 'secondary boycott' is of somewhat vague signification and has no precise and exclusive denotation, the courts, both Federal and state, are agreed that any combination will be held to be a secondary boycott if its purpose and effect are to coerce customers or patrons, through fear of loss or bodily harm, to withhold or withdraw their business relations from the employer who is under attack." *United Union Brewing Co. v. Beck,* 200 Wash. 474, 490, 93 P. (2d) 772.

This definition is equally in point where the parties coerced are suppliers rather than customers and patrons. The difficulty in applying it, of course, lies in determining whether the facts in a given case amount to coercion. In the instant case, the evidence shows that Moore notified four packing jobbers, all of whom were under contract with the Meat Cutters' Union, of the dispute. Two were notified verbally, and two by letter. The more strongly worded of the letters reads as follows:

"Mr. Henry L. Coffin, President    June, 19th, 1947
Gibson Packing Company
Yakima, Washington
Dear Mr. Coffin:

"Local, 529, AMC & BW of N.A. Yakima, Washington is picketing the East Side Market at Pasco, Washington. This is a bona-fide labor dispute sanctioned by the Local Union as well as the Pasco-Kennewick Central Labor Council.

"It is our desire that the Gibson Packing Company refrain from selling or delivering any products to the East Side Market.

"Thanking you in advance for your cooperation, I remain,
"Sincerely yours,
[signed]
W. E. Moore, Secretary
AMC & BW of N.A. Local 529
Labor Temple
Yakima, Washington."

A witness, employed by the Twin City Livestock and Poultry Company, testified that Moore had visited him, told him that the East-Side Market was unfair, and requested that he sell no meat to it. In spite of this, he appears to have done so. Another witness, the manager from the Carnation Company, testified that a retail grocer told him that he and four other grocers would quit his company completely if he delivered to the East-Side Market. He then visited Moore at the Union headquarters, and Moore advised him not to cross the picket line. In consequence of these two factors, he ceased to deliver merchandise to the market.

This is the totality of the evidence on which plaintiffs' charge of secondary boycott (with respect to the Meat Cutters' Union at least) is based. The pickets made no attempt to interfere with deliveries of supplies, nor did they molest suppliers who crossed their lines. Contrary to the averments of the complaint, the evidence showed no "threat that if deliveries are made union action will be instituted against such suppliers and distributors." The only threat which actually seems to have been made was to the Carnation manager, and this was not by the union, but by a grocer operating in competition with the market.

We do not think this evidence sufficient to sustain a charge that the Meat Cutters' Union "coerced" appellants' suppliers. It might well have been true, as the trial court suggested, that there was no necessity for threats or violence on the part of the union, which could have supposed that the suppliers would comply with its requests simply to avoid labor trouble. But may we hold these requests "coercive"

merely because of the possibility that they might have had a coercive effect? Picketing itself may be coercive, in that customers or suppliers of a picketed establishment may refuse to cross an entirely peaceful picket line, not out of sympathy with the objectives of the pickets, but because of fears of possible reprisals; but in the absence of threats, either express or implied, that such reprisals would be forthcoming, no court would enjoin picketing for that reason alone.

We hold that the methods used by the Meat Cutters' Union to induce appellants' suppliers not to deal with the market were persuasive rather than coercive in nature; that consequently the boycott applied was against the market only, and primary rather than secondary; and that, therefore, under the circumstances of this case, it was lawful and not subject to injunction.

■ As for appellants' claimed damages, it is true that appellants have suffered a loss as a result of this boycott, as well as a result of the picketing; but the damage to the business of persons subject to a primary boycott, lawfully conducted, is one of the inconveniences for which the law does not afford a remedy. *Robison v. Hotel & Restaurant Employees*, 35 Idaho 418, 207 Pac. 132, 27 A. L. R. 642.

■ If appellants are not entitled to injunctive relief against the Meat Cutters' Union, then they are clearly not entitled to such relief against the Teamsters' Union. In their complaint, appellants alleged that a conspiracy existed between the two unions. But in the words of the trial court, "there is not one bit of testimony of any combination among unions to prevent this place from getting its supplies." It is true that several truck drivers refused to deliver supplies to the market during the picketing. However, the only one called as a witness, a member of the Teamsters' Union, testified as follows:

"Q. Why did you not make the deliveries? A. I recognized the picket line. Q. There was a picket line there? A. Yes, sir. Q. Were you given any instructions to recognize it? A. No. Q. Did you call any member of the Union to inquire whether you were entitled to? A. I went to the Union Hall,

yes. Q. What happened? A. I never got any answer whether to deliver or not."

One witness, engaged in the produce business, on hearing of the picketing, telephoned the Teamsters' Union and was told by an unidentified person that he should not sell or deliver any produce to the market, whereupon he ceased to do so. This in itself is hardly sufficient evidence on which to construct a claim of secondary boycott. On the whole, the evidence presented does nothing more than indicate that the members of the Teamsters' Union respected the Meat Cutters' picket line. It will not support an injunction against the Teamsters' Union itself, or justify an order compelling it to pay appellants damages.

The decree of the lower court is affirmed.

BEALS, MALLERY, and GRADY, JJ., concur.

HILL, J., concurs in the result.

STEINERT, J. (concurring in part and dissenting in part)— I *concur* with the majority in holding that the evidence is insufficient to support an injunction against the *Teamsters' Union* or to justify an order compelling that union to pay appellants damages. I *disagree* with the majority in holding that the methods used by the *Meat Cutters' Union* were persuasive, rather than coercive, and that its boycott was lawful and not subject to injunction. As to the latter union, I think the decree entered by the trial court should be reversed and appellants' petition granted.

I therefore concur in the result of the majority opinion in so far as the Teamsters' Union is involved and dissent in so far as the Meat Cutters' Union is concerned.

JEFFERS, C. J., SCHWELLENBACH, and SIMPSON, JJ., concur with STEINERT, J.

---

August 12, 1949. Petition for rehearing denied.