[No. 31346. Department One. July 27, 1951.]

HARLAN MORRIS, *Respondent*, v. LOCAL UNION No. 494 OF
THE AMALGAMATED MEAT CUTTERS AND BUTCHER
WORKMEN OF SPOKANE *et al.*, *Appellants*.[1]

*R. Max Etter*, for appellants.

*Lionel E. Wolff* and *Richard W. Axtell*, for respondent.

HILL, J.—This is an appeal from a decree enjoining picketing.

Harlan Morris acquired a grocery store and meat market in Spokane in 1946. The market was operated separately

[1]Reported in 234 P. (2d) 543.

from the grocery store, although it occupied a portion of the same premises. When Morris took the market over, it was a union shop employing a union meat cutter. Morris changed the method of merchandising meat from that of the traditional butcher shop, with over-the-counter sales, to that of sales of packaged meats. The meat was wrapped in cellophane with the price marked on each package, and was placed in what is referred to as a "coolerator," from which customers could make their own selections. At all times with which we are here concerned, Morris did not employ a meat cutter; he himself cut the meat.

Morris operated under an agreement with Local Union No. 494 of the Amalgamated Meat Cutters and Butcher Workmen of Spokane, Washington, and Vicinity, hereinafter called the union, until September 1, 1948. Prior to that date, he notified the union that he would not sign another contract on the same terms and conditions as the one under which he was then operating. Although there were some meetings and negotiations between Morris and the union, they apparently were foredoomed to failure, because the union would offer only one form of contract, insisting that all retail meat dealers must be governed by the same conditions, and Morris was insistent that, since he had no union employees, he would not agree to certain conditions in that contract.

In addition to Morris and his wife, who worked with him in the meat market, two girls had assisted with the packaging of the meat until some five days before the picketing began. Thereafter, Morris and his wife did all the work and had no employees in the meat department.

Picketing began November 22, 1948, and was both peaceful and truthful, the placard of the pickets stating, " 'This meat dept. is not a Union market.' " The picketing resulted in the stopping of delivery of all supplies for resale. It was clear that, if continued, it would involve the closing of the Morris's place of business, and that Morris had no plain, speedy, or adequate remedy at law. He sought and obtained a temporary injunction and, after a trial on the merits, the

injunction was made permanent. From that decree, this appeal is taken.

As found by the trial court, the facts which are essential to a determination of this appeal are as follows: (1) that Morris had no employees in his meat department who were members of the union, and that there was no dispute between Morris and any of his employees regarding wages, hours, terms, or conditions of employment; (2) that the union demanded that Morris sign a contract by the terms of which (a) either Morris or his wife must join and remain a member of the union, (b) Morris must recognize the union as the exclusive bargaining agency for any employees he may have in his meat department, and (c) Morris must retain in his employment only members in good standing of the union; (3) that by reason of the refusal by Morris to submit to the union's demands, the union, for the sole purpose of compelling Morris to accept that contract, picketed his place of business. From these findings, the trial court concluded that the acts of the union were coercive and unlawful and contrary to the policy expressed in Rem. Rev. Stat. (Sup.), § 7612-2 [P.P.C. § 695-3], and that Morris was entitled to an injunction.

The union on this appeal urges: (1) that there was a labor dispute and that an injunction was prohibited by Rem. Rev. Stat. (Sup.), § 7612-1 *et seq.*; and (2) that in any event the injunction was a violation of the union's right of free speech.

Appellants seek to distinguish the present case from those which have recently been decided in this court, such as *Swenson v. Seattle Central Labor Council*, 27 Wn. (2d) 193, 177 P. (2d) 873, 170 A. L. R. 1082; *Gazzam v. Building Service Employees International Union, Local 262*, 29 Wn. (2d) 488, 188 P. (2d) 97 (same case in the United States supreme court: *Building Service Employees International Union, Local 262, v. Gazzam*, 339 U. S. 532, 94 L. Ed. 1045, 70 S. Ct. 784); *Hanke v. International Brotherhood of Teamsters, etc., Local 309*, 33 Wn. (2d) 646, 207 P. (2d) 206 (same case in the United States supreme court: *International Brother-*

*hood of Teamsters, etc., Local 309, v. Hanke,* 339 U. S. 470, 94 L. Ed. 995, 70 S. Ct. 773); *Cline v. Automobile Drivers & Demonstrators Local Union No. 882,* 33 Wn. (2d) 666, 207 P. (2d) 216 (considered with the *Hanke* case in the United States supreme court).

We have consistently held that there is no labor dispute within the purview of Rem. Rev. Stat. (Sup.), §§ 7612-1, 7612-13, where no member of the picketing union is employed by the person whose premises are picketed. See the *Gazzam* case, *supra,* where prior decisions are reviewed. Subsequent to the *Gazzam* case, see the *Hanke* and *Cline* cases, *supra; Pacific Nav. & Trading, Inc., v. National Organization of Masters, etc., West Coast Local 90,* 33 Wn. (2d) 675, 207 P. (2d) 221; *Wright v. Teamsters' Union Local No. 690,* 33 Wn. (2d) 905, 207 P. (2d) 662.

Appellants seek to take this case out of the "no labor dispute" category by insisting that Morris bore such a relationship to the picketing union as to bring the case within the orbit of our holding in *Wright v. Teamsters' Union Local No. 690, supra,* in which we held that there was a labor dispute and refused to enjoin the picketing. That Morris was not a member of the picketing local is conceded, but it appears that, until shortly before the picketing started, he held a "retiring card" issued by the international union of which the local is a member. This card stated that the person holding it

". . . retires from this organization [the international] for the purpose of engaging in other business, or for other reasons in accord with the laws governing the International Union."

The card evidenced the right of the person to whom it was issued to be "readmitted in any Local Union" of the international, under certain conditions.

It would seem that until one who has "retired" under such circumstances has deposited his retiring card and been "readmitted" to a local union, he is not a member of the international union. The secretary of the appellant local advised Morris that he was not considered a member. In

any event, Morris had his name withdrawn from the list of retired members prior to the time the picketing began. We agree with the trial court that Morris was not a member of the union, and that the *Wright* case, *supra*, is not controlling.

Appellants also urge that Morris had interfered when one of the girls who had been employed by him was about to sign an application for union membership. This was denied by Morris. The trial court did not accept the union's version of the occurrence and refused to make a finding that there had been such interference.

Appellants have failed to distinguish the present case from those heretofore referred to in which it was held that there was no labor dispute when the person picketed had no employees who were members of the picketing union.

We now come to the constitutional question of whether there is here involved any interference with the union's right of free speech. The supreme court of the United States has on numerous occasions held that the fact that pickets are "strangers" to the person picketed (*i.e.*, that he has no employees in the picketing union) does not prevent their picketing from being permissible under the constitutional guarantee of free speech; but it is also recognized that there are certain limitations to the right of free speech. In the *Swenson*, *Gazzam*, *Cline*, and *Hanke* cases, *supra*, we have so recently discussed those limitations that reiteration is uncalled for.

We note that here, as has so frequently been the situation in the more recent picketing cases, we are dealing with "little business," and, to the extent that Morris and his wife were operating the meat market without employees, the question of whether the injunction prohibiting picketing violates the union's right of free speech is expressly answered in the negative by the supreme court of the United States in *International Brotherhood of Teamsters, etc., Local 309, v. Hanke, supra*, in which Justice Frankfurter, announcing the judgment of the court, stated the question as follows:

"Does the Fourteenth Amendment of the Constitution bar a State from use of the injunction to prohibit the picket-

ing of a business conducted by the owner himself without employees in order to secure compliance by him with a demand to become a union shop?"

In the course of that opinion, in a discussion of the efforts of the courts

". . . to strike a balance between the constitutional protection of the element of communication in picketing and 'the power of the State to set the limits of permissible contest open to industrial combatants,' "

it is said:

"Here we have a glaring instance of the interplay of competing social-economic interests and viewpoints. Unions obviously are concerned not to have union standards undermined by non-union shops. This interest penetrates into self-employer shops. On the other hand, some of our profoundest thinkers from Jefferson to Brandeis have stressed the importance to a democratic society of encouraging self-employer economic units as a counter-movement to what are deemed to be the dangers inherent in excessive concentration of economic power. 'There is a widespread belief . . . that the true prosperity of our past came not from big business, but through the courage, the energy and the resourcefulness of small men . . . and that only through participation by the many in the responsibilities and determinations of business, can Americans secure the moral and intellectual development which is essential to the maintenance of liberty.' Mr. Justice Brandeis, dissenting in *Liggett Co. v. Lee*, 288 U. S. 517, 541, 580."

As in the *Cline* and *Hanke* cases, *supra*, we have here the owner of a business who desired to remain open and do business at hours when the contract offered by the union required that the business be closed.

Appellants here, realizing that the *Cline* and *Hanke* cases are decisive of this case if this is found to be a self-employer operation, urge as bases for distinction that it "was not a self-employer operation but was an operation where the employers worked along with other employees," that there was no evidence of coercion, and that no question of public policy is involved.

We cannot agree with appellants, either that this was not a self-employer operation or that, if there was an em-

ployer-employee relationship, no question of public policy or coercion is involved. It seems to us that at the time the picketing began and the action for injunctive relief was commenced, this was a self-employer operation involving only Morris and his wife, and that, hence, this case is governed by the *Cline* and *Hanke* cases.

But if employees were involved in the operation of the meat department, as appellants contend, the trial court was correct in its finding that the purpose of the picketing was coercive and intended to force either Morris or his wife to join and remain a member of the union, and to force Morris to compel his employees to join the union regardless of their personal desires in the matter, contrary to the declared public policy of this state. Rem. Rev. Stat. (Sup.), § 7612-2.

Without again repeating the language of the supreme court of the United States in *Building Service Employees International Union, Local 262, v. Gazzam, supra,* quoted at length in the discussion of law point No. 2 in *Ostroff v. Laundry & Dye Works Drivers' Local No. 566,* 37 Wn. (2d) 602-605, 225 P. (2d) 419, we again refer to it and express the view that it is applicable to and decisive of the present case. To claim as the reason for picketing Morris's business establishment that the picket line contributed to the free interchange of thought and communication of ideas and factual information in the city of Spokane, and that it was not to coerce Morris into signing the "take it or leave it" contract offered by the union, is to put reality aside. That contract, as the trial court found, would compel Morris or his wife to join the union, and would require Morris to compel his employees, if any, to join the union.

If this is a self-employer case, it falls within the rule of the *Cline* and *Hanke* cases, *supra*; if employees are involved, the *Gazzam* case controls.

No question has been raised as to the form of the decree.

The decree appealed from is affirmed.

SCHWELLENBACH, C. J., BEALS, and DONWORTH, JJ., concur.

FINLEY, J. (dissenting)—In 1933, the legislature of the state of Washington enacted the so-called "Little Norris-LaGuardia act." The Federal Norris-LaGuardia act served as a model for this legislation and for comparable laws in numerous other states. All of these statutes were very similar, and in many respects identical in language. Unquestionably they were enacted to assist and favor the cause of organized labor. Considering the era in which they were passed and the definite legislative intent or purpose prompting their enactment, it is somewhat difficult for me to conceive how a contrary intent or purpose seriously can be attributed to this legislation. Yet that is what has happened in our state, and in a very brief period of time.

The really significant provisions of our "Little Norris-LaGuardia act," its enforcement provisions, placing a restraint upon the unlimited issuance of labor injunctions by the courts of this state, were held to be unconstitutional in *Blanchard v. Golden Age Brewing Co.*, 188 Wash. 396, 409, 63 P. (2d) 397. This was despite the vigorous and scholarly dissent of Judge Blake, supported in separate dissents by Judge Beals and Judge Millard. Thus, the statute for all practical purposes was completely emasculated by the decision in the *Blanchard* case. But it has been resurrected—at least in part. Its statement of policy (Laws of 1933, Ex. Ses., chapter 7, § 2, p. 10, Rem. Rev. Stat. (Sup.), § 7612-2) originally drafted to favor the cause of labor, has been subverted. It has been warped contrariwise and is now destructive of the original intent and purpose of the act. Judicial rather than legislative architects have wrought this abrupt mutation.

In the majority opinion, the position is taken that *Gazzam v. Building Service, etc.*, 29 Wn. (2d) 488, 188 P. (2d) 97, is controlling, if respondent Morris had any employees. *Hanke v. International Brotherhood of Teamsters, etc., Local 309*, 33 Wn. (2d) 646, 207 P. (2d) 206, on the other hand, is said to be controlling if no employees were involved and the business was employer-operated.

The *Gazzam* case is to be criticized in my opinion, in as much as it was based on the theory that the policy of the labor disputes act, expressed in Rem. Rev. Stat. (Sup.), § 7612-2, disapproved picketing for a closed shop; see Judge Blake's dissent in *Fornili v. Auto Mechanics' Union, etc.*, 200 Wash. 283, 93 P. (2d) 422, and Judge Hamley's dissent in *Ostroff v. Laundry & Dye Works Drivers' Local No. 566*, 37 Wn. (2d) 595, 225 P. (2d) 419. The *Gazzam* case, of course, was also based somewhat upon the theory that stranger picketing is unlawful *per se.* However, that theory is in direct conflict with the explicit policy of the state of Washington as it was expressed legislatively by Rem. Rev. Stat. (Sup.), § 7612-13(c). In addition, such reasoning is probably not in accord with the Federal constitution; see *American Federation of Labor v. Swing*, 312 U. S. 321, 85 L. Ed. 855, 61 S. Ct. 568; *Building Service Employees' International Union Local 262 v. Gazzam*, 339 U. S. 532, 539, 94 L. Ed. 1045, 70 S. Ct. 784. Admittedly, the supreme court of the United States, without qualification or analysis of it, has accepted our decision in the *Gazzam* case as authoritative in the matter of state policy. Seemingly, as a practical matter, state policy thus ascertained is now to be the guide in determining the legality or illegality of picketing. This appears to be in contrast to the view formerly dominant that picketing, being more or less an equivalent of free speech, is entitled to the protection of the United States constitution (the *Swing* case).

Now, if no employees were involved and the business of Mr. Morris was employer-operated, it is a most strained, if not impossible, construction of Rem. Rev. Stat. (Sup.), § 7612-2 [P.P.C. § 695-3], to conclude that it in any manner disapproves of the picketing of an *employer-operated* business, which has no employees who could be subjected to coercion. The alleged legislative policy as construed by our court to justify the result in the *Gazzam* case actually seems to have no basis for application in the *Hanke* situation. In the latter decision, our court reiterated from *Gazzam* that stranger picketing always amounts to unlawful coercion, and further supported its result with the argument that the

union's interest in the welfare of its members was out-weighed by the interest of the community in allowing small business to operate free from dictation by "outside inter-ests." This was purely and simply an argument of policy. It is judicial in origin rather than legislative. The last policy expression of our *state legislature* relative to labor and picketing was in the "Little Norris-LaGuardia act." The legislative policy explicitly set forth in that statute does not in any way support the above argument.

I find no *legislative* intent expressed in the statutes of this state justifying the results reached in the *Hanke* case, in the *Gazzam* case, or in the majority opinion in the case at bar. It seems to me that in each instance judicial intent prevailed over legislative intent. This is inconsistent with my understanding of the principle inherent in the separa-tion-of-powers doctrine and the proper functioning of each co-ordinate branch of government in its respective field. Applying a clearly stated or apparent legislative purpose or policy, particularly where it is based upon state *police* power and its exercise by the legislature, is one thing. It is quite another matter to synthesize such a purpose or policy through judicial inference and construction. The latter situation certainly is one that calls for judicial self-restraint of a very high order. If we are to talk about legislative in-tent at all, and the policy of our "Little Norris-LaGuardia act," it appears to me that a result opposite from that reached in the majority opinion is indicated.

I dissent.