MAGGIE HAGEN and ERNEST H. HAGEN,

*Plaintiffs,*

vs.

CULINARY WORKERS ALLIANCE LOCAL NO. 337
and WILLIAM A. AYLWARD,

*Defendants.*

(No. 2550; July 22nd, 1952; 246 Pac. (2d) 778)

166

For the plaintiffs the cause was submitted upon the brief of Bard Ferrall and James A. Greenwood of Cheyenne, Wyoming.

For the defendants the cause was submitted upon the brief of Teno Roncalio and Louis A. Mankus of Cheyenne, Wyoming.

## OPINION

BLUME, Chief Justice.

This action was commenced on April 23, 1951. Plaintiffs allege that they jointly own and operate, and have for a long time operated, a restaurant in the City of Cheyenne, Wyoming, under the name of "Coffee Cup" at 619 East Lincoln Highway, Cheyenne, Wyoming, and that they are owners of the building in which the restaurant is located; that defendant Culinary Workers Alliance Local No. 337 is a union organization of certain culinary and restaurant workers in the City of Cheyenne and that William A. Aylward is the Secretary of the local union; that prior to July 12, 1950, defendants demanded of plaintiffs that plaintiffs cause and require the employees of plaintiffs to join Local Union No. 337 and that plaintiffs thereafter require all

employees to be and remain members of said Local Union No. 337 as a necessary condition to employment by plaintiffs; that the only employees of plaintiffs are women who are cooks, waitresses and dishwashers who are employed in said restaurant; that none of the employees of plaintiffs in July, 1950, were, or since have been, members of Local Union No. 337; that plaintiffs refused to comply with the demands made of them and refused to require any employee to become a member of Local Union No. 337; that plaintiffs have not at any time taken any part on the question as whether or not an employee should or should not join Local 337 or any other union and have refused to influence their employees in any regard to joining or not joining the union, taking the position that the employees themselves should determine whether they should or should not join the union. Paragraph IV of the petition is as follows: "That notwithstanding the fact that there has been no controversy between plaintiffs and said defendants William A. Aylward and Local 337, or any of the officers or members of said Local 337, said defendants and the officers and members of said Local 337, acting in concert and in conspiracy to injure and damage plaintiffs' business, did on or about the 12th day of July, 1950, place, post and parade a picket at the said patron and front entrance of said restaurant; that such a picket has been so placed, posted and paraded practically each and every day since said 12th day of July, 1950; that said picket is changed from time to time during the day; that from July 12, 1950, until on or about September 15, 1950, such picket was placed, posted and paraded each day from about five o'clock A.M. until twelve o'clock Midnight; that at all times since September 15, 1950, such picket has usually operated at the meal hours of six o'clock A.M. to eight o'clock A.M., eleven o'clock A.M. to two o'clock P.M., and five o'clock P.M. to seven o'clock P.M.; that such

picket parades back and forth upon said sidewalk in front of said entrance upon a line running east and west, about twelve feet long and about five feet from said entrance at the closest point; that such picket while parading as aforesaid wears a banner of the kind known as 'sandwich picket banner' which bears upon each side the words 'This Place Unfair to Local 337' in large letters so arranged and displayed that persons walking upon the sidewalks near said restaurant and occupants of vehicles driven upon said Lincoln Highway past or to said restaurant can easily read said words stated thereon." Paragraph VI of the petition is as follows: "That many of plaintiffs' employees have worked for plaintiffs for more than four years; that all of said employees now are, and in July, 1950, and the following were women; that all of said employees are efficient and neat; that the sole purpose of defendants in picketing the place of business of plaintiffs is to compel said employees to become members of said Local 337; that plaintiffs have no control over their employees as to whether they shall or shall not join said Local 337; that it is wrongful, unfair, unlawful and inequitable for defendants to direct business from plaintiffs and damage and injure the business of plaintiffs in their attempts to force employees of plaintiffs to join said Local 337." It is further alleged that such picketing has been an annoyance to the patrons of the restaurant of plaintiffs; that the business has materially declined since the time of such picketing and that plaintiffs have been damaged in the sum of $4,000; plaintiffs ask an injunction against such picketing and damages.

Defendants in their answer admit that the plaintiffs operate the restaurant as alleged and that they "in a duly unified effort together with the joint Board of Culinary Workers and Bartenders Union did maintain pickets near the Plaintiffs' place of business with ban-

ners, said banner bearing the words 'This place unfair to Local 337' "; they deny the allegations of the petition not admitted; they alleged that said picketing has not been accompanied by any act or threat of violence, force or fraud, and that it has not impeded the access, ingress, or egress, or passage to and from said premises by any persons; that the picket was placed after a full fair opportunity had been offered to the plaintiffs to enter into negotiations with the collective bargaining agent of the waitresses of the City of Cheyenne, Wyoming; and said picketing was embarked upon by the defendants in pursuit of the constitutional rights of free expression of opinion and the opinion of the central labor body in the City of Cheyenne ,Wyoming.

It appears that evidence was introduced by the parties respectively herein. Thereupon the trial court on its own motion, thinking that the disposition of the case depended wholly upon constitutional questions, reserved to this court for its determination the following questions:

"1. If a Labor Union in Wyoming, because of an employer's refusal to sign an agreement (attached) to employ Union members *only*, without contacting employer's employees or discussing with them conditions of their work or the desirability of their joining the Union, pickets the employer's premises and in such picketing states that the employer is unfair to the local Union, is such picketing

(a) An exercise of the right of free speech as set out in Article 1, Section 20 of the Constitution of the State of Wyoming, or

(b) An exercise of the right of peaceable assembly as set out in Article 1, Section 21 of the Constitution of the State of Wyoming?

"2. Does Article 5, Chapter 54, Wyoming Compiled Statutes of 1945 influence or affect the Court's answer to question number one?"

Question No. 2 is not a constitutional question and will not, accordingly be answered herein.

It is contended by the defendants that the trial court should have decided the meaning of the statutes of this state; that such decision would have disposed of the case and that accordingly this court ought not to consider the constitutional questions until the trial court has decided the meaning of the statute. They cite in re Gillette Daily Journal, 44 Wyo. 226, 11 P. (2d) 265, and other cases. While it is true that the statutes of this state must be considered in determining the questions submitted to us, we hardly think that the determination of the meaning thereof alone would dispose of the case. The main point to be considered is as to what is meant by the term freedom of speech, and that not alone under our own constitution, but also under the Fourteenth Amendment to the Constitution of the United States. And in view of the fact that the amendment embodies ideas of free speech, the decisions of the United States Supreme court are controlling.

We should have been better satisfied if the court had found all the facts, and had submitted that finding along with the questions reserved. However, the case has been pending a long time, and we do not want to delay the determination thereof on technical grounds. The picketing is admitted; so is the fact that there was no dispute between plaintiffs and their employees; the fact—inferentially at least—that none of the employees belonged to defendant union at the time of the picketing; and that defendants wanted plaintiffs to enter into an agreement with them. In view of the fact that the court stated that the decision of the case depended entirely on the constitutional questions herein, we may assume, we think, that the court found the facts alleged in the petition in favor of plaintiffs. The question reserved does not state directly—as would have been bet-

ter—that the picketing was not accompanied by violence, but in view of (b) of the question, we may consider that fact as embodied therein.

Wyoming has been comparatively free of labor disputes. Employers, employees and unions alike have generally endeavored to settle all such disputes in a friendly manner, so that this is the first time that this court has been called on to rule on any question relating to the law of picketing. The question involved herein, namely, the relationship of picketing and freedom of speech, is not, in view of the conflicting authorities on the subject, without difficulty. In addition to numerous cases on the subject, articles in legal magazines have been very helpful and in which the leading cases on the subject have been reviewed. Among these are Teller in 56 Harvard Law Review, 180 to 218 (1942) ; Fraenkel in University of Pennsylvania Law Review, 1 to 12 (October 1950) ; Wollett in 26 Washington Law Review, 169 to 195 (August 1951) ; Lauritzen and Tobriner in 3 Sanford Law Review, 413 to 439 (April 1951) ; Frank in 18 University of Chicago Law Review, 6 to 10. See also Gregory, Labor and the Law (Rev. Ed.), 334 to 377. Plaintiffs herein contend in substance that if they complied with the demands of the union herein to sign the contract in question, they would be violating the provisions of the "Little Norris-LaGuardia" Act hereinafter mentioned; further, that the dispute herein does not involve a labor dispute and consequently there is no legal objection for the issuance of an injunction herein. Defendants on the other hand contend that the picketing in this case is in pursuance of freedom of speech guaranteed under the constitution of this state as well as the Fourteenth Amendment of the United States; further, that it is not necessary in order to justify picketing that the relationship of employer and employee exist. Counsel for defendants argue that the main object in this case was to better

the working condition in the establishment conducted by the plaintiffs and that such main purpose is one that is lawful and should be the controlling fact herein. They cite in that connection the case of Standard Grocer Co. v. Local Number 406 of American Federation of Labor, 321 Mich. 276, 32 N.W. (2nd) 519, 524. They quote from the opinion of the Chief Justice in that case as follows: "It must be stated, at the outset, that if the object of this picketing was to coerce the plaintiff into forcing the men into joining the Union, that would not be a lawful labor objective." That statement agrees, as we shall show hereinafter with the cases on the subject generally. The Chief Justice in that case proceeded to state further that the main object was to bring the working standards up to those of the union members; that that was a lawful object and should control. The case is not very good authority for the contentions of plaintiffs herein. The opinion of the Chief Justice in that case stands alone; the remainder of the court decided the case under the Taft-Hartley Law, held that it was unlawful for defendant to attempt to coerce the plaintiff in forcing his employees to join a union, and ordered an injunction. They further stated that they did not understand what the Chief Justice decided. Counsel for defendants admit that one of the objects in this case was to coerce the plaintiffs to sign a union contract. Counsel use the terms "persuade" and "induce" but the terminology is not of importance. If one of the purposes of the union, namely, to coerce the plaintiffs in signing a union contract is unlawful then, though we may admit the benevolent purpose of the union in other respects, nevertheless the action of the union was unlawful. It was held in Fred Wolferman, Inc. v. Root, 356 Mo. 976, 204 S.W. (2d) 733, 174 A.L.R. 585, that if a lawful purpose is coupled with an unlawful purpose, the fact that one of several purposes is lawful does not make the picketing lawful. The case

was cited with approval in Kincaid-Webber Motor Co. v. Quinn (Mo.), 241 S.W. (2d) 886. A number of other cases are cited. In Restatement of the Law of Torts, p. 137, § 796, it is stated: "When workers engage in concerted action against an employer for more than one object and one or more of the objects are improper, their action is not for a proper object so long as they insist on the improper objects." To the same effect is Texas State Federation of Labor v. Brown and Root, Inc. (Tex. Civ. App.) 246 S.W. (2d) 938, 942, and cases cited.

"In 1937 the American judiciary was in universal agreement that labor had the right to strike and to engage in a peaceful primary boycott for a lawful purpose, namely, better wages, hours, or other terms and conditions of employment. By contrast, most courts denied any independent right to picket. Picketing was legal only if carried on in connection with a lawful strike. A small number of courts recognized the lawfulness of picketing in the absence of a strike, but at least as many held picketing illegal per se, and statutes, ordinances, and police regulations proscribed or drastically curtailed the practice of picketing. Even those courts which sanctioned the right to picket in furtherance of a strike were quick to emasculate the right. Thus the employer could terminate the strike—and with it legal picketing—by hiring others to take the strikers' places, or by showing that the picketing had continued for a long time, or upon proof that business continued as usual." 56 Harvard Law Review 180. See also 43 C.J.S. 728, § 143, Note 67; 43 C.J.S. 740, 741, Notes 70 and 71, Gregory Labor and the Law (Rev. Ed.) 337. Then came a number of cases after 1939 in which the Supreme Court of the United States held that under the First and Fourteenth Amendments of the Constitution of the United States, picketing is a species of freedom of speech and cannot be prohibited. Among these cases are Thornhill v. Alabama, 310 U. S. 88, 84 L.Ed. 1093, 60 S. Ct. 736; Carlson v. California, 310 U. S. 106, 84 L. Ed. 1104, 60 S. Ct. 746; and American Federation of Labor v. Swing, 312 U. S. 321, 85 L. Ed. 855, 61 S. Ct. 568. In the last of these cases the court held that pick-

eting was justified in order to create a union shop even though there was no dispute between the employer and the employees. It was apparently thought for some time that the rule of freedom of speech above mentioned applied in all the cases of peaceful picketing. It is doubtful, however, that that was the thought of the court. In the case of Carpenters and Joiners Union, etc. v. Ritter's Cafe, 315 U. S. 722, 86 L. Ed. 1143, 62 S. Ct. 807, decided in 1942, the court held that picketing was lawfully restricted by state rule to picketing at the industry involved in the dispute. Teller in 56 Harvard Law Review 189, states: "The identification of picketing with free speech attained its greatest intensity in the Swing case. Acting both upon the holding and reasoning of the Supreme Court, a number of state courts legalized picketing in the absence of a strike," and on page 197 he states: "No adequate ground exists to explain why the Court in the Swing case condemned Illinois for limiting the right to picket to places where employers are in controversy with their employees, whereas in the Ritter's Cafe case, Texas was permitted to restrict picketing to the industry involved in the dispute." See also Gregory, Labor and the Law, supra, 361. Justice Douglas in the case of Bakery and Pastry Drivers, etc. v. Wohl, 315 U. S. 769, 86 L. Ed. 1178, 62 S. Ct. 816, 819, decided in 1942, stated: "Picketing by an organized group is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated." This foreshadowed statements made by the court in decisions on May 8, 1950, namely, the case of International Brotherhood, etc. v. Hanke, 339 U. S. 470, 70 S. Ct. 773, 775, 94 L. Ed. 995, 13 A.L.R. (2d) 631, Building Services Employees International Union Local 262 v. Gazzam, 339 U. S. 532, 70 S. Ct. 784, 94 L. Ed. 1045, Hughes v. Superior Court, 339 U. S. 460, 70 S. Ct. 718, 721, 723, 94 L. Ed. 985. In the Hughes case, the court stated: " 'The domain of liberty, withdrawn by the Fourteenth Amendment from encroachment by the states,' * * * no doubt includes liberty of thought and appropriate means for expressing it. But while picketing is a mode of communication it is inseparably something more and different. Industrial picketing 'is more than free

speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated.'" The court further said: "The policy of a State may rely for the common good on the free play of conflicting interests and leave conduct unregulated. Contrariwise, a State may deem it wiser policy to regulate. Regulations may take the form of legislature, e.g., restraint of trade statutes, or be left to the ad hoc judicial process, e.g., common law mode of dealing with restraints of trade. Either method may outlaw an end not in the public interest or merely address itself to the obvious means toward such end. The form the regulations should take and its scope are surely matters of policy and, as such, within a State's choice." In the Hanke case, the court stated: "Here, as in Hughes v. Superior Court, 339 U. S. 460, 70 S. Ct. 718, we must start with the fact that while picketing has an ingredient of communication it cannot dogmatically be equated with the constitutionally protected freedom of speech. Our decisions reflect recognition that picketing is 'indeed a hybrid.'" And in that case it is held that the Fourteenth Amendment does not bar a state from use of the injunction to prohibit the picketing of a business conducted by the owner himself, without employees, in order to compel him to convert to union shop. This on the ground that the court would not interfere with the State's judgment in striking a balance between competing social-economic interests, and in deciding that it was more important to employers than to prohibit the restriction entailed upon communication, which the unions sought to convey through picketing. In the Gazzam case a State injunction against peaceful picketing was upheld because the picketing was for the unlawful objective of having the employer coerce his employees' selection of a bargaining representative. We shall refer to this case further on in this opinion.

The result of these and other decisions left the law in regard to peaceful picketing, perhaps to some extent, in confusion and uncertainty. The court in Wilson v. Hacker, 101 N.Y.S. (2d) 461, 476, summed up the situation as follows: "Prior to the decisions of the U. S.

Supreme Court handed down during the 1949-1950 term, it would have been necessary to consider the impact of the First and Fourteenth Amendments of the U. S. Constitution upon the power of the court to enjoin peaceful picketing. The earlier decisions in the period from 1940 to 1948 had identified peaceful picketing with freedom of speech and had severely ilmited the power of the state legislatures and state courts to forbid such picketing. The authority of these decisions has been impaired, if they have not been wholly overruled, by the recent decisions. It is now recognized that picketing is not merely the exercise of the right of freedom of speech; it is recognized that it has a coercive force which goes beyond the effort to persuade by an appeal to reason, and that the use of this economic weapon may be enjoined if the objective, which is sought to be attained by its use, is unlawful under state law. Giboney v. Empire Storage & Ice Co., 336 U. S. 490, 69 S. Ct. 684, 93 L. Ed. 834; Building Service Employees International Union v. Gazzam, 339 U. S. 532, 70 S. Ct. 784; Hughes v. Superior Court, 339 U. S. 460, 70 S. Ct. 718; International Brotherhood of Teamsters v. Hanke, 339 U. S. 470, 70 S. Ct. 773." Frank in 18 University of Chicago Law Review, page 8, states that the court in the Hanke case "cut the earlier picketing decisions to their barest bones." And he further states on page 9, "To the extent that picketing is practiced, this decision, turning the prerogative of enjoining picketing back to the state courts for substantially any reason of labor policy which may appeal to them, is an important development in labor relations." Fraenkel in University of Pennsylvania Law Review, page 11, thinks that in view of late decisions the following principles may be drawn:

"1. Indiscriminate bans on peaceful picketing whether by statute or injunction violate the Constitution.

"2. Peaceful picketing may be enjoined when it is part of an activity which the state, whether by its legislature or its highest court, has declared contrary to public policy—subject, of course, to the proviso that such a declaration be itself constitutional. It is thus in this area that the discussion is likely to take place in the future since state courts will be sufficiently astute to take the hint contained in Mr. Justice Frankfurter's opinion and hereafter to declare as illegal any objective toward which the picketing which they seek to enjoin is directed.

"3. Between these extremes lies an area about which no safe prediction can be made—that is, if the state courts, failing to take the hint, let such an area remain. There the validity of a ban on peaceful picketing will depend on whether the majority of the Supreme Court considers that the state has confined the picketing to an 'unrealistic' area.

"We have traveled a long way. For a time it seemed as though peaceful picketing were going to receive real constitutional protection. Now it looks as though state courts, by the simple device of declaring union objectives contrary to public policy, can ban peaceful picketing in almost all situations where there is room for difference of opinion as to these objectives."

We shall now review, in the light of what has been said, the cases which have more or less direct bearing on the case at bar and involve the question as to whether or not employers can be coerced in forcing employees to join a union. And we might say, before proceeding that we are not confronted with a legislative act under which employers may make a contract only with the majority of employees. We have no such legislative act, and that situation is in no way involved herein.

We have heretofore referred to the case of Standard Grocer Co. v. Local No. 406 A.F.L., a Michigan case, in which the chief justice stated that picketing in order to coerce the employer in forcing employees into join-

ing a union would not be lawful. That had already been decided by the supreme court of Michigan in Silkworth v. Local 575 A.F.L., 309 Mich. 746, 16 N.W. (2d) 145. That case was decided under what we may consider the common law. Apparently no statutory rule was involved. The case was decided in 1944. The court reviewed the various previously decided cases by the United States Supreme Court, but held, as above stated. In that case the union attempted to get the employers to pay the initiation fees of the employees. But the particular kind of control demanded by a union is not, we take it, of any particular importance, if the ultimate aim is unlawful in whole or in part. And though it is not directly stated, the case clearly involves the principle that no man is compelled to join a union.

In Fred Wolferman, Inc. v. Root, 356 Mo. 976, 204 S.W. (2d) 733, 174 A.L.R. 585, and Kincaid-Webber Motor Co. v. Quinn (Mo.), 241 S.W. (2d) 886, decided under the National Labor Relations Act, the court held that when a union attempted to coerce plaintiff to recognize it as the bargaining agent when in fact the employees had rejected such representation, it could be enjoined from picketing, and that such picketing was not in pursuance of freedom of speech.

In Wilbank v. Chester & Delaware Counties B., H. & R. E. U., 360 Pa. 48, 60 A. (2d) 21, it appears that the Pennsylvania Labor Relations Act made it an unfair labor practice for an employer to interfere with, restrain or coerce employees in the exercise of the rights guaranteed by the act. The court held that the right of not joining the union was guaranteed under the provisions of section 5 of the act (Session Laws 1937, Vol. 1, page 1172), which was in the following words (similar to the provisions of our own Legislative act hereinafter mentioned), to-wit: "Employees shall have the right of self-organization, to form, join or

assist labor organizations to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection." The court held that where a majority of plaintiffs' employees had not joined defendant union and preferred to exercise the right of not joining any union, and plaintiffs refused to sign a contract which would require plaintiffs to employ only union employees because they did not wish to coerce their employees, and the union commenced picketing to compel plaintiffs to force their employees into a union or discharge them and employ others who were members of the union, such picketing was unlawful, subject to injunction and not in the exercise of freedom of speech. The court stated: "Defendants' purpose in picketing was to require plaintiffs to force their employees to join the union or to discharge them and employ others who are members of the union. Such a purpose is clearly unlawful and subject to restraint."

A similar question was before the court in Phillips v. United Brotherhood of Carpenters, etc., 362 Pa. 78, 66 A. (2d) 227, 228. In that case the court stated: "The question arises, therefore, whether a labor organization can properly be allowed to picket an establishment in order to coerce the employer into an action which is made an unfair labor practice and therefore forbidden by a statute of the Commonwealth. Coercion is not necessarily limited to threats of violence to a person or his property but may be quite as effective by causing him substantial business losses. The court below refused a permanent injunction under the misapprehension that peaceful picketing, being a right which, generally speaking, is constitutionally guaranteed as one of free speech, is necessarily and under all circumstances lawful, whereas, by the latest decisions of the United States Supreme Court, of this court, and of

other jurisdictions, it is well established that free speech is not involved where the labor objective is illegal and that, under such circumstances, picketing may properly be enjoined."

In the case of Local Union No. 519 v. Robertson (Fla.), 44 So. (2d) 899, 902, it appears that constitutional and statutory provisions protecting persons not belonging to a union are somewhat stronger than in most of the states. Nevertheless what the court said on that subject is interesting and is in part as follows:

"By these provisions of the Constitution and the statutes the public policy of the State of Florida with respect to labor activities and labor opportunities has been set forth and defined. Under these provisions it is the declared public policy of the State that all working men, whether union or non-union, shall be considered on an equal footing with respect to labor opportunities. They are guaranteed complete freedom of decision in whether to join or refrain from joining any labor organization. No person or organization may deny them the right of obtaining or retaining employment, nor may the right be abridged, by reason of membership or non-membership in any labor organization. They are not to be coerced or intimidated in the enjoyment of their legal rights, including the right of free decision as to whether or not they will join a union, and any person or labor organization who so coerces or intimidates them is to be deemed guilty of a crime punishable by fine or imprisonment, or both."

In the case of E. H. Renzel Co. v. Warehousemen's Union, etc., 32 Calif. App. (2d) 111, 89 P. (2d) 435, 436, the syllabus as appears in the Pacific Reporter is as follows: "Under statute prohibiting contracts between employer and employee whereby either party undertakes or promises to join or to remain a member of some specific labor organization, and providing

penalties for violation, picketing and boycott activities of trade union to force employer to contract to compel employees to join labor union or be discharged were properly enjoined, since trade union acts were designed to compel employers by unlawful means to do an act which is by statute declared unlawful. Gen. Laws Supp. 1933, Act 4104, §§ 1, 2." The Court said in part as follows: "Here it is conceded that all the acts of defendants of which the plaintiff complained were acts designed for the sole purpose of compelling the employer to force his employees to join in the type of contract denounced by the act. * * * The acts of the defendants herein were conducted for an unlawful purpose since they were all designed to compel the plaintiff by unlawful means to do an act which was expressly declared unlawful."

In Roth v. Local Union No. 1460 of Retail Clerks Union, 216 Ind. 363, 24 N.E. (2d) 280, 282, it appears that the state had a statute reading as follows: "The individual unorganized worker * * * should be free to decline to associate with his fellows, * * * have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." The court in that case stated: "The statute here under consideration declares that it is the public policy of this state that the individual unorganized worker shall be free to decline to associate with his fellows and that he shall be free from interference, restraint, or coercion on the part of his employer. This must mean that no labor union may demand that an employer require his employee to join such union, because no em-

ployer has the right to require an employee to join or refrain from joining a labor union. Any person or group which undertakes to coerce an employer to do that which is contrary to the express public policy of this state thereby undertakes to compel the performance of an unlawful act. The lawful weapon of peaceful picketing may not be utilized to accomplish such an unlawful purpose. It is quite immaterial that the things done to bring about the unlawful purpose were not per se unlawful. This is our interpretation of our statute."

A similar question was presented to the Washington Supreme Court in the case of Gazzam v. Building Service Employees, etc., 29 Wn. (2d) 488, 188 P. (2d) 97, rehearing denied in 34 Wn. (2d) 38, 207 P. (2d) 699. In that case it was held that the statute declaring the state's policy that an unorganized worker may decline to associate with his fellow employees and shall be free from interference, restraint or coercion by his employer means that a labor union may not demand that an employer require his employees to join a union, and peaceful picketing may not be utilized to accomplish such unlawful purpose. In that case the court quoted and approved the statement quoted from the Indiana case supra. The case was appealed to the Supreme Court of the United States and appears as Building Service Employees Internat'l Un. Local 262 v. Gazzam, 339 U. S. 532, 70 S. Ct. 784, 787, 94 L. Ed. 1045. In that case the court in affirming the judgment of the state court said: "The State of Washington has by legislative enactment declared its public policy on the subject of organization of workers for bargaining purposes. The pertinent part of this statute is set forth in the margin. The meaning and effect of this declaration of policy is found in its application by the highest court of the State to the concrete facts of the instant case. Under the so-enunciated public policy of Washington,

it is clear that workers shall be free to join or not to join a union, and that they shall be free from the coercion, interference, or restraint of *employers of labor* in the designation of their representatives for collective bargaining. Picketing of an employer to compel him to coerce his employee's choice of a bargaining representative is an attempt to induce a transgression of this policy, and the State here restrained the advocates of such transgression from further action with like aim. To judge the wisdom of such policy is not for us; ours is but to determine whether a restraint of picketing in reliance on the policy is an unwarranted encroachment upon rights protected from state abridgment by the Fourteenth Amendment. * * * Here, as in Giboney, the union was using its economic power with that of its allies to compel respondent to abide by union policy rather than by the declared policy of the state. That State policy guarantees workers free choice of representatives for bargaining purposes. If respondent had complied with petitioners' demands and had signed one of the tendered contracts and lived up to its terms, he would have thereby coerced his employees. The employees would have had no free choice as to whether they wished to organize or what union would be their representative."

The latest case as far as we have found on the subject before us, is the case of Morris v. Local Union No. 494 (Wn.), 234 P. (2d) 543, in which it was held that where picketing of a meat market was coercive and intended to force either a self-employer or wife to join a union, and to force a self-employer to compel any employees to join a union regardless of their personal desires, such picketing was contrary to the public policy of the state and would be enjoined, and the union would not thereby be denied the right of free speech. To a like effect see Voeltz v. Bakery and Confectionery

Wkrs. Int. Un. of Am. Local No. 37 (Cal. App.), 233 P. (2d) 624.

It would seem to be clear that these cases are decisive of the question before us. We know of none directly contrary thereto. They are based on the right that persons are free to join or not to join a union and that for employers to coerce them in that connection is unlawful and goes beyond freedom of speech. Coercing on the part of employers is forbidden by Section 54-501 W.C.S. 1945, passed in 1933, and which is part of the so-called Little Norris-LaGuardia Act. The section reads as follows: "It is hereby declared to be the policy of the State of Wyoming that workers have the right to organize for the purpose of protecting the freedom of labor, and of bargaining collectively with employers of labor for acceptable terms and conditions of employment, and that in the exercise of the aforesaid rights, workers should be free from the interference, restraint or coercion of employers of labor, or their agents in any concerted activities for their mutual aid or protection." It is true that the section does not specifically state that persons are entitled to choose whether to join a union or not. But that is implied therein as truly as under Section 5 of the Pennsylvania Labor Relations Act already heretofore quoted in full. The right to join a labor union implies the right not to join one. 63 C.J. 679. The right to join or not join a union is contained in the Washington statutes (Chapter 7 Session Laws, Special Session 1933) as follows: "though he should be free to decline to associate with his fellows." That is the language used in the Norris-LaGuardia Act of Congress passed on March 23, 1932. See United States Code, Title 29, Chapter 6, Section 102. That expression was thrown in evidently merely for the purpose of showing that freedom of action on the part of employees as theretofore existing was not intended to be infringed. Article 1, Section 2 of our constitution states

that: "In their inherent right to life, liberty and the pursuit of happiness, all members of the human race are equal." This provision is similar to the Declaration of Independence—which is one of the heritages which this state has with every other—and which reads as follows: "We hold these truths to be self-evident; that all men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and pursuit of happiness." Is there any logical reason for saying that the right to choose to belong to a union or not to belong is excluded from this guaranty of liberty and pursuit of happiness? We think not. We think that these provisions guaranty free choice in this respect to every man and no legislative provision is necessary in that connection to further this guaranty. In fact we know of no cases which hold that a man may be deprived of this right of choice. In 31 Am. Jur. § 17, p. 843, it is stated that: "laborers have the right to refrain from joining such unions as they choose." In 63 C.J. 679, § 42, it is stated: "Like all other voluntary societies labor unions must depend for their membership on the free and untrammeled choice of each individual member, the right to join a labor union implying the right not to join one. Hence, no resort can be had to compulsory methods of any kind to increase, keep up or retain such membership. In Longshore Printing Company v. Howell, 26 Or. 527; 38 P. 547, 551; 28 L.R.A. 464, the court stated: "It must be understood, however, that these associations, like other voluntary societies, must depend for their membership upon the free and untrammeled choice of each individual member. No resort can be had to compulsory methods of any kind either to increase, keep up, or retain such membership. Nor is it permissable for associations of this kind to enforce the observance of their laws, rules, and regulations through violence, threats, or intimidation, or

to employ any methods that would induce intimidation or deprive persons of perfect freedom of action. Such organizations may be preserved, and their membership augmented, by reasoning and fair arguments, and even by persuasion and entreaty, and an observance of their adopted constitutions and by-laws may be exacted through the same peaceful means, but beyond this it is not advisable from a legal standpoint, to venture."

In Curran v. Galen, 152 N. Y. 33, 37; 46 N.E. 297; 37 L.R.A. 802; the court stated: "Public policy and the interest of society favor the utmost freedom in the citizen to pursue his lawful trade or calling, and if the purpose of an organization or combination of workingmen be to hamper, or to restrict, that freedom, and, through contracts or arrangements with employers, to coerce other working men to become members of the organization and to come under its rules and conditions, under the penalty of the loss of their positions, and of deprivation of employment, then that purpose seems clearly unlawful and militates against the spirit of our government and the nature of our institutions." We think that these decisions represent the law and the public policy of this state. If plaintiffs in the case at bar, had complied with the demands of the union and had signed the tendered contract, and lived up to its terms, then in the language of the United States Supreme Court in the Gazzam case they would have coerced their employees. The employees would have had no free choice as to whether they wished to organize or what union would be their representative. The action of the union therefore was coercion and was beyond the pale of free speech.

It would be interesting to have statistics to show the percentage of cases in which picketing had the result sought by a union. If the present case is any criterion, it is quite apparent that the percentage must be small.

In eight months the union's efforts resulted in merely trouble to itself, the plaintiffs, to their employees and to the public. The human mind is so constituted, at least in a democracy such as ours, that persuasion attempted by pressure generally results in no persuasion at all, but has the opposite effect on both employers as well as employees alike. It is in the main self-interest, aided perhaps by quiet, unobtrusive persuasion that is effective. It cannot be a sound and healthy policy to encourage long, drawn-out picketing. If medicine is administered and has no beneficial effect within a reasonable time, it is apt to prove to be deleterious.

It follows from what we have said that we are constrained to hold that we must answer the question No. 1 reserved by NO.

RINER, J., and ILSLEY, J., concur.